**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MICHAEL D. SLOAS,

*Plaintiff-Appellee,*

v.

CSX TRANSPORTATION,
INCORPORATED, a corporation,

*Defendant-Appellant.*

———————————————

ASSOCIATION OF AMERICAN
RAILROADS,

*Amicus Supporting Appellant.*

No. 09-1249

MICHAEL D. SLOAS,

*Plaintiff-Appellant,*

v.

CSX TRANSPORTATION,
INCORPORATED, a corporation,

*Defendant-Appellee.*

———————————————

ASSOCIATION OF AMERICAN
RAILROADS,

*Amicus Supporting Appellee.*

No. 09-1288

Appeal from the United States District Court
for the Southern District of West Virginia, at Huntington.
Robert C. Chambers, District Judge.
(3:07-CV-00504)

Argued: May 11, 2010

Decided: July 26, 2010

Before TRAXLER, Chief Judge, and NIEMEYER
and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Chief Judge Traxler and Judge Niemeyer joined.

## COUNSEL

**ARGUED**: Andrew E. Tauber, MAYER BROWN, LLP, Washington, D.C., for Appellant/Cross-Appellee. William A. Kvas, HUNEGS, LENEAVE & KVAS, PA, Minneapolis, Minnesota, for Appellee/Cross-Appellant. **ON BRIEF:** Melissa Foster Bird, HUDDLESTON BOLEN LLP, Huntington, West Virginia, for Appellant/Cross-Appellee. W. Michael Frazier, FRAZIER & OXLEY, L.C., Huntington, West Virginia, for Appellee/Cross-Appellant. Louis P. Warchot, Daniel Saphire, Washington, D.C., for Association of American Railroads, Amicus Supporting Appellant/Cross-Appellee.

## OPINION

AGEE, Circuit Judge:

   Michael Sloas, a sheetmetal worker employed by CSX

Transportation, Inc. ("CSXT"), injured his back while attempting to remove a damaged Snyder valve from a locomotive's fuel tank. Subsequently, Sloas applied for and received a disability annuity under the Railroad Retirement Act ("RRA"). *See* 45 U.S.C. § 231 et seq. Sloas also sued CSXT for negligence under the Federal Employers Liability Act ("FELA"),[1] *see* 45 U.S.C. § 51 et seq., and obtained a jury award in his favor.

On appeal, we consider the district court's denial of (1) CSXT's request for a set off against the FELA award based on its contributions to the Tier II fund used to pay a portion of Sloas' RRA disability benefits, and (2) Sloas' request for judgment as a matter of law in his favor on the issue of contributory negligence. For the following reasons, we affirm the judgment of the district court.

## I.

We begin with a summary of the evidence presented at trial, the jury's apportionment of fault, and the district court's disposition of the parties' post-trial motions.

## A.

On January 21, 2005, CSXT employees were attempting to service and redeploy a locomotive that had been sideswiped. Sloas was tasked with removing and replacing the locomotive's damaged Snyder valve, an aluminum valve that threads into the neck of a locomotive's fuel tank in order to secure the fuel cap. Damage to the Snyder valve precluded Sloas from using the preferred tool for this procedure, a spanner wrench.

Sloas testified that he first attempted to break the valve

---

[1]*See Wildman v. Burlington N. R.R. Co.*, 825 F.2d 1392, 1395 (9th Cir. 1987) ("FELA provides the sole and exclusive remedy for injured employees of railroad carriers engaged in interstate commerce.").

loose using a twenty-four inch pipe wrench. When this effort failed, Sloas further testified that he went to the tool room to retrieve a sawzall or reciprocating saw and a forty-eight inch pipe wrench. According to Sloas, no sharp blades were available for the sawzall and his attempt to use that saw to cut the Snyder valve merely scratched the valve's surface. CSXT cast doubt on Sloas' testimony, however, by presenting evidence that Sloas did not consistently mention the lack of sharp sawzall blades to his supervisors, as well as by eliciting testimony from an assisting coworker who did not recall the presence of a sawzall.

Sloas subsequently used a torch to heat the collar of the locomotive's fuel tank in the hope that the collar would expand and the valve would come loose. Once the valve was fully heated, Sloas unsuccessfully used a hammer in an attempt to dislodge it. Sloas and a coworker then tried to leverage the valve out using the forty-eight inch pipe wrench, but that effort also failed.

Consequently, Sloas reheated the collar of the fuel tank and he and his coworker repeated their use of the forty-eight inch pipe to lift the valve. In total, Sloas and his coworker used the forty-eight inch pipe wrench to apply pressure to the Snyder valve for approximately fifteen to twenty-five minutes. Sloas experienced back pain toward the end of their last attempt. Believing that he could "walk it off," Joint Appendix ("J.A.") at 79, Sloas initially did not mention his potential back injury to his coworker.

Both Sloas and his coworker then took a regularly scheduled break. Sloas testified that he later returned to the Snyder valve, used a hammer to "beat it," "heard a tone," and the valve "just c[a]me loose." *Id.* at 80. This version of events was contradicted by a report generated the night of the incident by CSXT's supervisory employees, which stated that Sloas indicated that he ultimately used a sawzall to remove the valve. Sloas completed his shift, but was instructed to fill

out an incident report after he informed his local union representative that he had "wrenched his back." *Id.* at 187. Once the reporting process was complete, Sloas drove home. By the time he arrived home he was "in a lot of pain." *Id.* at 89.

The next day Sloas went to the hospital for an x-ray and thereafter received extensive treatment from his family physician and a neurologist, who prescribed prescription pain killers and steroid injections. This treatment caused Sloas to have blurred vision and trouble concentrating.

Sloas returned to work at CSXT for two extended periods from June 2005 to December 2005, and again from May 2006 to June 2007. Due to Sloas' obvious pain, CSXT's management removed him from his position in June 2007 and instructed him to obtain medical authorization before returning to work. Sloas' neurologist never authorized a return to work at CSXT.

Testimony offered by CSXT employees at trial established that use of a pipe wrench or a sawzall was an appropriate method to remove Snyder valves and that the valves often proved difficult to remove. Several employees explained that a shortage of sharp sawzall blades at the repair facility was not uncommon, but that certain supervisors could retrieve sharp blades from a locked storeroom.

The evidence presented at trial, by Sloas and others, also established that CSXT had a policy against the use of "brute force." *See, e.g., id.* at 113, 222. CSXT's supervisory employees explained that this policy generally cautioned employees against "overexerting" themselves. *Id.* at 222; *see also id.* at 259 ("Brute force is just a terminology for straining yourself . . . . [D]on't just take it upon yourself to do something where there's an easier course to do it. If you can get help, get somebody else to help you. If you can use a crane or a hoist or something or a forklift, use something like that."). Several CSXT witnesses opined that Sloas violated this policy when

he continued to use the forty-eight inch pipe wrench to leverage the Snyder valve, despite a lack of discernable progress in removing it.

The jury ultimately determined that both CSXT and Sloas were negligent and that their combined negligence contributed to Sloas' back injury. When asked to apportion the percentage of Sloas' injury and the commensurate damages attributable to each party's negligence, the jury found CSXT and Sloas to be equally liable. The jury further determined that $160,000 in damages would fully compensate Sloas for his total injury. In accordance with the jury's apportionment of fault, the district court entered judgment in Sloas' favor in the amount of $80,000.

### B.

Post-trial, CSXT filed a motion under Federal Rule of Civil Procedure 59(e) to alter or amend the judgment.[2] Because Sloas received disability payments under the RRA based on his inability to return to work, CSXT argued that it was "entitled to a setoff against the jury's award of damages to [Sloas] in the amount of $2,107.49, as this number represent[ed] the present value of the disability benefits attributable to CSXT's contributions to the disability benefits received by [Sloas] during the time period of December 1, 2007 through December 1, 2008." *Id.* at 351-52. Without a setoff, CSXT argued it would be forced to "pay[ ] twice for the same loss," resulting

---

[2]CSXT first raised its request for a setoff in its post-trial Rule 59(e) motion to alter or amend the judgment. Although Rule 59(e) "provides no standard for when a district court may grant such a motion," we "have recognized three grounds for amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993). The district court properly considered CSXT's Rule 59(e) motion under the third category, as CSXT contends the denial of a setoff would be both legally erroneous and manifestly unjust.

in Sloas impermissibly receiving "double payment." *Id.* at 352.

The district court denied CSXT's request for a setoff. In so doing, it relied on the Supreme Court's statement in *Eichel v. N.Y. Central Railroad Co.*, 375 U.S. 253 (1963) that "'[t]he [RRA] is substantially a Social Security Act for employees of common carriers. . . . The benefits received under such a system of social legislation are not directly attributable to the contributions of the employer, so they cannot be considered in mitigation of the damages caused by the employer.'" J.A. at 443 (quoting *Eichel*, 375 U.S. at 254). The district court was not persuaded by CSXT's contention that the holding in *Eichel* was abrogated by Congress' subsequent amendment of the RRA in 1974. As the court explained,

> [i]t has been thirty-five years since this supposed "paradigm shift" occurred, yet apparently the only cases granting a setoff under the RRA that [CSXT] can muster are two state trial court cases, both decided in the last five months by courts in states outside the Fourth Circuit. *See Fairchild v. CSX Transp., Inc.*, Case No. 05-CI-06642 (Jefferson, Ky., Cir. Ct., Div.5, Sept. 3, 2008); *Radder v. CSX Transp., Inc.*, Index No.: I 2005-8536 (N.Y. Sup. Ct., County of Erie, Oct. 9, 2008). Moreover, while [CSXT] has produced the orders of these courts that grant the setoff in each case, these orders contain nothing of the courts' reasoning. [CSXT] also has produced portions of Congressional reports discussing the change in the funding of Tier 2 benefits, but nowhere do they indicate an intention to break with *Eichel*. The Court is not prepared to deviate from Supreme Court precedent on this authority. [CSXT] is seeking a setoff and it has the burden of demonstrating to the Court that it is entitled to one. [CSXT] has not succeeded in this endeavor.

*Id.* at 444.

After the jury rendered its verdict, the district court also ruled on Sloas' motion for judgment as a matter of law on the issue of contributory negligence under Federal Rule of Civil Procedure 50(b). Sloas argued that CSXT failed to identify "any act or inaction on [his] part that added to the risk of injury created by [CSXT's] negligence." Memorandum of Law in Support of Plaintiff's Rule 50(b) Motion at 4. Accordingly, Sloas argued that CSXT impermissibly asked "the jury to infer that [Sloas] was negligent from the happening of the accident." *Id.*

The district court denied Sloas' Rule 50(b) motion, opining that Sloas' arguments ignored evidence that he violated CSXT's "policy against the use of excessive force." J.A. at 439. The court noted that CSXT's witnesses testified "that each employee must know his [or her] own physical limitations and what constitutes excessive force for him or her" and that Sloas "should have stopped trying to remove the valve with the wrench when it became apparent that the valve was not moving." *Id.* Because Sloas testified that he used the forty-eight inch wrench for an extended period of time and "discontinued this method only after injuring his back," the district court concluded "a reasonable jury could conclude that [Sloas'] own contributory negligence helped to cause his injury." *Id.* at 439-40.

Both CSXT and Sloas filed timely appeals and we have jurisdiction under 28 U.S.C. § 1291.

II.

On appeal, CSXT reasserts the argument it raised in the district court, *i.e.*, that the denial of "an offset of the Tier II disability benefits that were received by [Sloas] and funded in substantial part by CSXT . . . over-compensated [Sloas] and forced CSXT to pay twice for the same injury." Opening Brief

at 6-7. This result, according to CSXT, "is contrary to FELA, contrary to Supreme Court and Fourth Circuit precedent, and contrary to good public policy," as it provides "an invitation to opportunistic litigation." *Id* at 7.

Specifically, CSXT contends that the district court erred in holding that the Supreme Court's decision in *Eichel* precluded the grant of an offset. *See Stillman v. Norfolk & W. R.R. Co.*, 811 F.2d 834, 838 (4th Cir. 1987) (noting that *Eichel* held "that defendants in FELA cases are not permitted to inform the jury that a plaintiff has received benefits from a collateral source"). The *Eichel* Court considered the Railroad Retirement Act of 1937. It concluded that the RRA "is substantially a Social Security Act for employees of common carriers" and that "[t]he benefits receive under such a system of social legislation are not directly attributable to the contributions of the employer, so they cannot be considered in mitigation of the damages caused by the employer." 375 U.S. at 254 (quotation omitted).

Unlike benefits awarded under the 1937 act, CSXT argues that the "benefits at issue here, Tier II benefits were first established" by the Railroad Retirement Act of 1974. Opening Brief at 7. CSXT asserts that Tier II benefits are "analogous to a private employer paid pension," *id.* at 16 (quotation omitted), and "are in substantial part directly attributable to the contributions of the employer." *Id.* at 20 (emphasis and quotation omitted). Thus, CSXT contends that Congress' 1974 alteration of the statutory scheme not only abrogated *Eichel*'s holding, but also rendered an offset appropriate.[3]

---

[3]We reject CSXT's contention that *Eichel* was merely an evidentiary decision that did not address the appropriateness of the offset of a FELA award based on the receipt of RRA benefits. The *Eichel* Court's holding that the district court properly excluded "evidence of [RRA] disability payments" was a direct result of the Court's determination that RRA benefits constituted a "collateral" source. 375 U.S. at 255. As the Fifth Circuit noted in its exposition of the collateral source rule in *Phillips v. Western*

For his part, Sloas argues that the district court separately erred when it submitted the matter of contributory negligence to the jury. Sloas asserts that CSXT was not entitled to a contributory negligence instruction, as it failed to provide "evidence that [he] failed to exercise reasonable care." Response Brief at 14. Indeed, Sloas maintains that "[e]vidence that does not support" a contributory negligence instruction "includes a plaintiff assuming the risk of his or her employment, a plaintiff violating a general safety rule that does not provide specific guidance with respect to conduct, attacking a plaintiff's credibility or, relying on the mere fact that an accident and injury occurred." *Id.* Because, in his view, "[t]he evidence [CSXT] presented at trial fell [solely] within [these] four prohibited areas," Sloas maintains that "CSXT failed to meet its burden of proof to create a jury question concerning contributory negligence." *Id.*

## III.

We first consider CSXT's argument that it was entitled to deduct or offset the Tier II contributions it made, as Sloas' employer, against the jury's FELA award because Tier II funds paid a portion of Sloas' RRA disability benefits. Our review of the district court's denial of CSXT's Rule 59(e) motion is for an abuse of discretion. *See Robinson v. Wix Filtration Corp. LLC*, 599 F.3d 403, 407 (4th Cir. 2010). As we

---

*Co. of North America*, 953 F.2d 923, 929 (5th Cir. 1992), "[t]he substantive rule of no reduction [based on a collateral source] carries with it an evidentiary rule requiring the exclusion of evidence of any collateral benefits." *See also Green v. Denver & Rio Grande W. R.R. Co.*, 59 F.3d 1029, 1033 (10th Cir. 1995) (characterizing the Supreme Court's statement that "'it would be highly improper for the [RRA] disability pension payments to be considered in mitigation of the damages suffered'" as "necessary to the [Court's] holding" that evidence of Eichel's receipt of RRA benefits involved a substantial likelihood of prejudicial impact and that such evidence was therefore inadmissible at trial (quoting *Eichel*, 375 U.S. at 254)).

explained in *Wolfe v. Johnson*, 565 F.3d 140, 160 (4th Cir. 2009), the district "court necessarily abuses its discretion when it makes an error of law."

We begin our analysis by examining the nature of the connection CSXT draws between its Tier II contributions and the jury's FELA award. CSXT seeks an offset to that award in the amount of $2,107.49. According to CSXT's economic expert, this figure represents the portion of the after-tax Tier II disability benefits paid to Sloas from December 1, 2007 to December 1, 2008 which is directly attributable to CSXT's Tier II employer contributions. CSXT contends the $2,107.49 should be offset from the jury's FELA award because this sum was included in the jury's award of "$160,000.00 in damages, an amount that covers [Sloas'] uncontested $78,755.00 past wage loss calculation."[4] J.A. at 351.

Sloas responds that the jury in this case rendered a general verdict; therefore, it is impossible to know the basis upon which the jury awarded damages. We agree.[5] In this case, Sloas requested approximately $750,000 in damages and the district court informed the jury that it could award damages

---

[4]*See also* Opening Brief at 3 ("[T]he judgment entered against CSXT in favor of plaintiff compensated plaintiff for the wages he had lost between December 1, 2007 and December 1, 2008. Significantly, however, plaintiff also applied for and received disability benefits for that very same period—benefits that had been funded in substantial part by CSXT.").

[5]In its Response Brief, CSXT notes that Sloas never raised the jury's general verdict in his opposition to its motion to alter or amend the judgment. This apparent waiver argument is misplaced. CSXT, not Sloas, is appealing the district court's denial of its motion to alter or amend the judgment. An appellee may defend, and this Court may affirm, the district court's judgment on any basis supported by the record. *See Blum v. Bacon*, 457 U.S. 132, 137 n.5 (1982) ("It is well accepted . . . that . . . an appellee may rely upon any matter appearing in the record in support of the judgment below."); *see also Pitt County v. Hotels.com, L.P.*, 553 F.3d 308, 311 (4th Cir. 2009) (recognizing that this Court "may affirm on any grounds apparent from the record" (quotation omitted)).

for any or all of the following: (1) discomfort, pain, or incon-venience, (2) past lost wages, and (3) future lost wages. The total amount the jury ultimately deemed appropriate to fairly compensate Sloas for his injury was only $160,000, nearly eighty percent less than Sloas' requested damages award. We have no indication upon which of the three categories of dam-ages the jury based its verdict or in what combination.

On the facts in this case, it is not reasonable for us to assume the jury accorded Sloas the full measure of his requested award for past lost wages. *See, e.g.*, *Welsh v. Bur-lington N., Inc., Employee Benefits Plan*, 54 F.3d 1331, 1339 (8th Cir. 1995) ("Because the jury . . . rendered a general ver-dict . . . , we have no way of knowing exactly what portion of the $500,000 award was for pain and suffering and what portion was for future lost wages."). The difference between Sloas' requested damages and the jury's final award gives us "no way of knowing" the basis of that award.[6] CSXT, there-fore, cannot meet its burden of demonstrating that the denial of an offset would provide Sloas with double payment for his past lost wages.[7]

---

[6]It is noteworthy that CSXT has requested similar offsets of FELA awards in cases filed across the United States. Yet, in this case, CSXT failed to request a special verdict form that would reveal the bases for the jury's calculation of damages and specifically consented to tendering the general verdict form to the jury. *See* Dist. Ct. Docket No. 82.

[7]CSXT cites a number of cases from other jurisdictions, which it argues support the proposition that a setoff may be appropriate despite a jury's general verdict. Because these cases either offer no rationale for their holdings or involve a factual stipulation of some kind, we do not find them persuasive. *See, e.g.*, *Stanislawski v. Upper River Servs., Inc.*, 6 F.3d 537, 541 n.8 (8th Cir. 1993) (recognizing that the plaintiff conceded that "the jury presumably awarded the full amount of 'cure' he requested"), *Clark v. Burlington N., Inc.*, 726 F.2d 448, 451 (8th Cir. 1984) ("The jury undoubtedly considered the stipulated lost wages in calculating a damage award."). Even if we were to assume that a court may divine the basis for a jury's general verdict in circumstances where the record renders the jury's reasoning relatively clear, the facts of this case fall outside of these bounds.

But even if the jury's verdict did encompass Sloas' requested award of $78,755 in past lost wages, we conclude that CSXT cannot demonstrate that the district court abused its discretion in denying a setoff. The collateral source rule holds that "compensation from a collateral source should be disregarded in assessing tort damages."[8] *United States v. Price*, 288 F.2d 448, 449-50 (4th Cir. 1961). That a benefit "comes from the defendant tortfeasor does not itself preclude the possibility that it is from a collateral source."[9] *Id.* at 450. "The plaintiff may receive benefits from the defendant himself which, because of their nature, are not considered double compensation for the same injury but [are] deemed collateral."[10] *Id.*

---

[8] Assuming Congress' alteration of the RRA in 1974 abrogated *Eichel*'s precise holding, we remain bound by the Supreme Court's determination that the collateral source rule provides the appropriate framework for determining whether RRA benefits should be considered in calculating a FELA award. *See Eichel*, 375 U.S. at 254-56; *see also Raycraft v. Duluth, Missabe & Iron Range Ry. Co.*, 472 F.2d 27, 29 (8th Cir. 1973) ("[T]he Supreme Court, in the case of *Eichel v. New York Central R.R.*, 375 U.S. 253 (1963), held that the trial court had properly excluded evidence of compensation benefits for the purpose of impeachment, on the authority of the collateral source rule."). We, therefore, do not consider CSXT's argument that the underlying purposes of the collateral source rule are not served by its application to this case.

[9] *See also Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 931 (5th Cir. 1992) ("[T]his and other circuits have not narrowed the focus to the single question of the source of the benefits except in cases involving the government."); *Clark v. Burlington N., Inc.*, 726 F.2d 448, 450 (8th Cir. 1984) ("A benefit may be exempt from setoff under the collateral source rule even though the employer is the sole source of the fund.").

[10] CSXT cites our opinion in *Szedlock v. Tenet*, 61 Fed. Appx. 88, 94 (4th Cir. 2003) (unpublished), for the proposition that a benefit must be "received from a source distinct from the employer" in order to be deemed "collateral." CSXT's reliance on mere labels, however, is mistaken. Our opinion in *Fariss v. Lynchburg Foundry*, on which *Szedlock* relies, dealt with a "payment made *entirely* by the employer *directly* to the employee," 769 F.2d 958, 966 n.10 (4th Cir. 1985) (emphasis added), and held that payment not to be a collateral benefit. Unlike Fariss' benefits which came straight from an "employer-funded company retirement plan," *id.* at 963,

Thus, whether a given benefit is derived from a collateral source "depend[s] . . . upon the exact nature of the compensation received." *Id.* at 449. If the tortfeasor provides a benefit to the plaintiff "specifically to compensate him for his injury," the benefit does not constitute a collateral source. *Id.*; *see Clark v. Burlington N., Inc.*, 726 F.2d 448, 450 (8th Cir. 1984) (noting that the collateral source rule does not apply to "payments which the employer has undertaken voluntarily to indemnify itself against possible liabilities under the FELA"). Such payments may, therefore, be "taken into account in fixing tort damages," as "the tortfeasor need not pay twice for the same damage." *Price*, 288 F.2d at 449.

But if the tortfeasor does not provide the benefit to the plaintiff as compensation for his or her injury, the benefit is from a collateral source and "should not be offset against the sum awarded from the tort nor considered in determining that award." *Id.*; *see also Phillips v. The W. Co. of N. Am.*, 953 F.2d 923, 932 (5th Cir. 1992) (explaining that "the collateral source rule applies," for example, "to fringe benefits or deferred compensation"). We accordingly consider a benefit to be from a collateral source unless it results from "payments made by the employer in order to indemnify itself against liability." *Phillips*, 953 F.2d at 932 (quotation omitted).

To analyze the nature of CSXT's Tier II contributions, we must first explore the current structure of the RRA's compensation scheme.[11] The RRA of 1974 created a two-tiered bene-

---

Sloas' Tier II disability benefits under the RRA of 1974 were funded, much like Social Security benefits, by a commingled pool of employer and payroll taxes. We never suggested in *Fariss* that Social Security benefits could be anything but collateral; RRA disability benefits are likewise inappropriate for an offset. Therefore, even under the *Fariss* rationale, CSXT's Tier II contributions would be deemed collateral and would not be set off from the verdict.

[11]Under the RRA of 1937, individuals "who worked for both railroad and nonrailroad employers and who qualified for railroad retirement bene-

fit system in which Tier I corresponds to the benefits "an employee would expect to receive [under] the Social Security Act" and Tier II operates "like a private pension" tied to an employee's "earnings and career service."[12] *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 574-75 (1979). "'[L]ike Social Security, and unlike most private pension plans,'" RRA benefits are "statutory rather than contractual" and thus may be eliminated by Congress "'at any time.'" *Vollmar v. CSX Transp., Inc.*, 898 F.2d 413, 416-17 (4th Cir. 1990) (quoting *Hisquierdo*, 439 U.S. at 575).

Congress entrusted the administration of the railroad retirement system to "the Railroad Retirement Board, a federal agency, which determines an employee's eligibility for benefits and the amount of benefits to be paid." *Id.* These benefits are "funded under the Railroad Retirement Tax Act," which establishes "employer taxes and payroll taxes . . . employers are required to withhold from employee paychecks." *Id.* at 414. "Like any scheme of social insurance, the amount of taxes paid on behalf of a particular employee does not necessarily correlate with the amount of benefits to which the employee may become entitled." *Id.* at 416. In fact, not all employees "become eligible for benefits." *Id.* But "[n]either the employee nor the carrier is entitled to a refund of . . . taxes paid on behalf of an employee who never qualifies for benefits." *Id.*

---

fits and social security benefits . . . received retirement benefits under both systems," *U.S. R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 168 (1980), in an amount greater than that "they would have received had they not split their employment." *Id.* at 168 n.1. The payment of this "windfall benefit[ ] threatened the railroad retirement system with bankruptcy." *Id.* at 169. Congress accordingly passed the RRA of 1974 to eliminate the windfall benefit and place the federal railroad retirement "system on a 'sound financial basis.'" *Id.*

[12]Tier I benefits are taxed in the same manner as Social Security benefits, whereas Tier II benefits are taxed in the same manner as qualified private pensions. *See Ernzen v. United States*, 922 F.2d 1433, 1434 (9th Cir. 1991).

Under the RRA, employees may receive "payments for disability as well as for wages lost due to retirement." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 519 (1981). Eligible railroad employees thus receive what is "essentially a disability pension." *Welsh*, 54 F.3d at 1340. The Railroad Retirement Board's "disability regulations are substantively identical to" those under the Social Security Act. *Fountain v. R.R. Retirement Bd.*, 88 F.3d 528, 530 (8th Cir. 1996). An employee need not be injured on the job, or be currently employed by a railroad to receive disability benefits under the act.[13]

The foregoing summary of the nature of the RRA benefit scheme makes clear that CSXT's employer contributions were not "undertaken voluntarily to indemnify itself against possible liabilities under the FELA." *Clark*, 726 F.2d at 450. To the contrary, CSXT merely paid a mandatory tax instituted by Congress to further "a federally funded and administered social welfare program." *Vollmar*, 898 F.2d at 417. As the Supreme Court explained in the context of employer contributions to a state unemployment compensation fund,

> [t]rue, these taxes were paid by employers, and thus to some extent [CSXT] helped to create the fund. However, the payments to [Sloas] were not made to discharge any liability or obligation of [CSXT], but to carry out a policy of social betterment for the benefit of the entire state. We think these facts plainly show the benefits to be collateral. It is thus apparent from what we have already said that failure to take them into account in ordering [relief under FELA]

---

[13]*See* 45 U.S.C. § 231a(a)(iv) & (v) (providing that both (1) "individuals who have a current connection with the railroad industry, whose permanent physical or mental condition is such as to be disabling for work in their regular occupation," and (2) "individuals whose permanent physical or mental condition is such that they are unable to engage in any regular employment" are eligible for disability benefits).

> does not make [Sloas] more than "whole" as that phrase has been understood and applied.

*NLRB v. Gullett Gin Co.*, 340 U.S. 361, 364-65 (1951) (internal citations omitted).

We accordingly add to the body of other federal appellate decisions that have considered similar benefits and hold that RRA benefits, including those under Tier II, are a collateral source that may not be considered in determining a FELA award. *See Price*, 288 F.2d at 451 ("Where railroad employees have been disabled because of negligence and have sued their employers under [FELA], the courts have uniformly held that the retirement benefits could not be considered in calculating damages."); *see, e.g.*, *Green v. Denver & Rio Grande W. R.R. Co.*, 59 F.3d 1029, 1033 (10th Cir. 1995) ("We hold . . . that plaintiff's RRA disability annuity pension was a collateral source and not admissible to offset any damages award he might have received."); *Folkestad v. Burlington N., Inc.*, 813 F.2d 1377, 1380 (9th Cir. 1987) ("Payments under the Railroad Retirement Act, a social program funded by collections from the employer and employee . . . [are] designed to facilitate the retirement of elderly railroad employees, [and are thus] deemed to come from a collateral source.").

## IV.

We now turn to Sloas' contention that the district court erred in submitting the issue of contributory negligence to the jury. Our review of the district court's denial of Sloas' Rule 50(b) motion is de novo. *See King v. McMillan*, 594 F.3d 301, 312 (4th Cir. 2010). On appeal, we view the evidence in the light most favorable to the prevailing party and will affirm the denial of a Rule 50(b) motion unless we conclude that the jury lacked "a legally sufficient evidentiary basis" to find in that party's favor. *See id.* (quotation omitted).

Contributory negligence is an affirmative defense on which CSXT, as the defendant, has the burden of proof. *See Wise v.*

*Union Pac. R.R. Co.*, 815 F.2d 55, 57 (8th Cir. 1987); *Dixon v. Penn Cent. Co.*, 481 F.2d 833, 837 (6th Cir. 1973). The burden of proof in this regard is quite low, however, as the "defendant is entitled to a contributory negligence instruction if there is any evidence to support that theory." *Wilson v. Burlington N., Inc.*, 670 F.2d 780, 782 (8th Cir. 1982). Indeed, the Supreme Court has explained that

> [d]amages and contributory negligence are so blended and interwoven, and the conduct of the plaintiff at the time of the accident is so important a matter in the assessment of damages, that the instances would be rare in which it would be proper to submit to a jury the question of damages without also permitting them to consider the conduct of the plaintiff at the time of the injury.

*Norfolk S. R.R. Co. v. Ferebee*, 238 U.S. 269, 273 (1915).

In this case, our review of the record in the light most favorable to CSXT demonstrates that the district court did not err in submitting the matter of contributory negligence to the jury. CSXT presented evidence at trial that tended to show that Sloas, for example, did not initially attempt to use the sawzall to remove the Snyder valve, or that his efforts to secure sharpened blades were nonexistent or quite minimal. Crediting either version of events would have provided the jury with a sufficient evidentiary basis to find contributory negligence. *See Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 507 (1957) (stating that in determining whether to submit the question of negligence to the jury courts are "narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence . . . played any part at all in the injury or death").

The jury was entitled to reach the commonsense conclusion that a mechanical means of removing the Snyder valve, such as the use of the sawzall, entailed less risk of physical injury

than the repeated manual use of a pipe wrench. A finding of contributory negligence could reasonably stem from the jury's conclusion that Sloas either failed to initially use the sawzall to remove the valve, or to make a sufficient effort to locate the appropriate blades for the saw. *See Tiller v. Atl. Coast Line R.R. Co.*, 318 U.S. 54, 68 (1943) ("'Where the facts are in dispute, and the evidence in relation to them is that from which fairminded men may draw different inferences,' the case should go to the jury (quoting *Washington & G.R. Co. v. McDade*, 135 U.S. 554, 572 (1890))).

Contrary to Sloas' contention, the evidence supporting the jury's conclusion that he was contributorily negligent does not implicate the doctrine of assumption of the risk. It is well established that "[a] plaintiff cannot be held to assume the risk in a FELA case." *Brown v. Cedar Rapids & Iowa City Ry. Co.*, 650 F.2d 159, 165 (8th Cir. 1981); *see* 45 U.S.C. § 54. The "voluntary, knowledgeable acceptance of a dangerous condition that is necessary" for an individual "to perform his duties constitutes an assumption of risk." *Taylor v. Burlington N. R.R. Co.*, 787 F.2d 1309, 1316 (9th Cir. 1986). In contrast, contributory negligence "is a careless act or omission on the plaintiff's part tending to add new dangers" to preexisting conditions. *Id.*

Evidence that Sloas failed to appropriately utilize the safest, *i.e.*, mechanical, means to remove the Snyder valve clearly constitutes evidence of contributory negligence, as it does not pertain to "risks inherent in [Sloas'] job." *Id.* at 1317. Instead, this evidence went to a careless act or omission on Sloas' part that added new risks to that already inherent in his task. *See Jenkins v. Union Pac. R.R. Co.*, 22 F.3d 206, 211 (9th Cir. 1994) ("We continue to adhere to the traditional rule that when an employee carries out his supervisor's general order in an unsafe manner, he is responsible under FELA for his own contributory negligence.").[14]

---

[14]We also reject Sloas' assertion that the jury's conclusion that he was contributorily negligent rested on the mere fact that he was injured. *See*

## V.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

---

*Hernandez v. Trawler Miss Vertie Mae, Inc.*, 187 F.3d 432, 438 (4th Cir. 1999) ("The mere fact that an accident occurs or that injury is sustained does not prove negligence."). CSXT presented evidence that Sloas failed to utilize the safest means of removing the Snyder valve, *i.e.*, that the initial use of a sharpened sawzall blade would have prevented his injury. The jury was entitled to credit this evidence in concluding that Sloas was contributorily negligent.