**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 12-2303**

─────────────

JAMES DURHAM,

            Plaintiff-Appellee,

        v.

SHERIFF ROBERT N. JONES,

            Defendant-Appellant,

and

SOMERSET COUNTY,

            Defendant,

and

SOMERSET COUNTY, MARYLAND; HEBRON SAVINGS BANK,

            Garnishees.

────────────────────────────────────────────────

THE NATIONAL FRATERNAL ORDER OF POLICE,

            Amicus Supporting Appellee.

─────────────

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  William M. Nickerson, Senior District
Judge.  (1:10-cv-02534-WMN; 1:12-cv-02757-WMN)

─────────────

Argued:  October 30, 2013          Decided:  December 10, 2013

─────────────

Before MOTZ, GREGORY, and DAVIS, Circuit Judges.

---

Affirmed by published opinion. Judge Davis wrote the opinion in which Judge Motz and Judge Gregory joined.

---

**ARGUED:** Julia Doyle Bernhardt, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellant. Howard Benjamin Hoffman, Rockville, Maryland, for Appellee. **ON BRIEF:** Douglas F. Gansler, Attorney General of Maryland, John B. Howard, Jr., Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellant. Steven H. Goldblatt, Director, Nilam A. Sanghvi, Supervising Attorney, Rita K. Lomio, Supervising Attorney, Jeffrey P. DeSousa, Student Counsel, Robyn R. English, Student Counsel, Lindsey Oken, Student Counsel, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellee. Larry H. James, Christina L. Corl, CRABBE, BROWN & JAMES, LLP, Columbus, Ohio, for Amicus Curiae.

---

DAVIS, Circuit Judge:

This appeal arises from a $1.1 million jury award in favor of a terminated employee on a claim of retaliation for the exercise of his First Amendment rights.

A veteran deputy sheriff used pepper spray and physical force to subdue a motorcyclist fleeing from a fellow law enforcement officer. The deputy duly prepared his report of the incident and submitted the report to his superiors, who in turn passed it along to their superiors. Alarmed that a damages lawsuit against the Office of the Sheriff might result from the deputy's actions, officers in the upper echelon of the chain of command authorized detectives to interrogate him aggressively, while ordering him to revise his incident report. The deputy opposed this order as factually and legally unwarranted. After the deputy broadly publicized to numerous public officials, the media, and others, what he described as corrupt and unlawful practices occurring in the Office of the Sheriff, the Sheriff terminated his employment.

The sole issue presented in this appeal is whether the district court erred in failing to grant qualified immunity to the Sheriff. For the reasons stated within, we hold that the district court did not err and accordingly, we affirm the judgment.

I.

To a significant extent, the cardinal facts underlying this appeal are undisputed but, as always in an appeal from a district court's denial of a motion for judgment, we summarize the evidence in the light most favorable to the prevailing party in the district court. Sloas v. CSX Transpo., Inc., 616 F.3d 380, 392 (4th Cir. 2010).

Appellee James "Troy" Durham, who had worked in public safety and law enforcement for nearly twenty years, was employed as one of about twenty deputy sheriffs in the Somerset County, Maryland, Sheriff's Office (SCSO). On August 21, 2008, while on routine patrol, Durham used pepper spray and physical force to detain a suspect in the course of assisting a Maryland state trooper arresting a man fleeing from the trooper on a motorcycle. Shortly after the incident, as Durham was preparing his report,[1] Captain Bill Lewis of the SCSO came into Durham's office to confirm that he was preparing a report. Captain Lewis "slammed his fist down on [Durham's] desk, and in a very loud, rude manner, he said, 'Good, because Mr. Pitts, the suspect, has been transported to the hospital, claiming that he is injured.'" J.A. 104.

---

[1] Durham's incident report consisted of a narrative account of the incident and a separate "use of force" document.

Durham's report included the following statements explaining his use of force on the suspect:

> Based on DFC[2] Durham's training, knowledge, and experience, in self-defense, DFC Durham delivered two forearm blows to the ridge area under the suspect's nose, in an effort to gain control of the suspect and to overcome the resistance that the suspect was putting up.

> ***

> DFC Durham then delivered two knee blows to the left side of the suspect's body in an effort to gain control of the suspect and to overcome the resistance that the suspect was putting up.

J.A. 453. Durham provided copies of his report to his immediate supervisors. Despite Durham's use of the terms "self-defense" and "resistance" in describing the need for force against the suspect, Durham has unfailingly insisted throughout these proceedings that he regarded his role in the encounter as merely one of assisting the pursuing state trooper in detaining the fleeing suspect. The suspect did not assault Durham and, from Durham's perspective, he had no basis whatsoever to charge the suspect with a criminal offense.[3]

---

[2] Durham's official title with the SCSO was as a Deputy First Class.

[3] After the suspect had been subdued, the state trooper immediately assumed custody of the suspect and transported him to the nearby barracks.

5

The next day, August 22, 2008, although Durham's immediate supervisors had approved his reports, Captain Lewis asked Durham to complete another Use of Force report using a different form. Captain Lewis also asked Durham if he needed to go to the hospital, suggesting obliquely that Durham surely must require medical attention as a result of the incident the day before. Durham stated that he was not hurt or in need of medical attention. Durham added a follow-up report to his initial report explaining this exchange with Captain Lewis.

Four days later, on August 26, 2008, Durham's supervisors explicitly ordered him to charge the suspect with assaulting Durham and resisting arrest. The supervisors further told Durham that if he failed to do so, Durham himself would be charged with assaulting the suspect. Durham then spoke with other supervisory officers, and based on those consultations, he decided he would not place charges against the suspect. Durham also detailed these exchanges in a second follow-up report.

On August 27, 2008, Durham received a memorandum from Captain Lewis, advising him that Detective Sergeants Renny Miles and George Nelson, two specially-trained criminal investigators with the SCSO, would supervise Durham in correcting the "deficiencies" in his report. At this time, Durham contacted his attorney through his collective bargaining organization, the Fraternal Order of Police, giving him copies of his original

report and the memorandum. Again, Durham detailed the exchange with Captain Lewis in a third follow-up report.

Upon reporting for duty on August 29, 2008, Durham was escorted into an interrogation room by Detectives Miles and Nelson, where they aggressively questioned him about his use of force report.[4] Durham asked to have his attorney present. Miles refused to permit Durham to contact his attorney, had Durham read and sign a document containing the Miranda[5] warnings, and continued to question him with increasing aggressiveness. Durham then told Miles and Nelson that he had already retained an attorney and given his attorney a copy of Durham's original police report and the follow-up reports. Miles insisted that Durham must revise his original police report and delete the follow-up reports; if Durham did not, he would be charged both internally and criminally with assault on the suspect. Specifically, Miles instructed Durham to remove the facts

---

[4] Durham testified that, in addition to the tenor and tone of the overall encounter, Miles pulled his chair so close to Durham's chair at the initiation of the interrogation that he was able to place his leg between Durham's legs and press up against them. Miles ignored Durham's protests over this maneuver.

[5] Miranda v. Arizona, 384 U.S. 436 (1966).

concerning his use of force against the suspect.[6] Miles also instructed Durham to delete the follow-up reports as they each reported how superior officers had asked him to change his reports.

Durham did not believe that he should revise any of his previous reports; as he later testified, it was his understanding that when any law enforcement officer signs a report "you're swearing under oath and swearing to God that that's the truth, that's the facts of the case." J.A. 108. As the interrogation continued, Miles threatened to take Durham's gun and badge if he did not change his report.

Durham theorized that the reason the superior officers wanted him to revise his report, and charge the suspect with assault and battery and resisting arrest, was to "cover the Sheriff's office." J.A. 109. Durham suspected that the supervisors anticipated the suspect would file a complaint of excessive force (and perhaps a lawsuit), and "wanted to have everything lined up in case that event happened[.]" Id.[7]

---

[6] This included "[t]he inner forearm that [Durham] used as a compliance move against [the suspect] in order to get him to comply. And the knee strikes[.]" J.A. 125.

[7] The record before us contains no indication that such a complaint (or lawsuit) was ever filed. Nor does the record reflect what if any charges were placed against the suspect by the arresting state trooper.

Durham persisted in his refusal to revise the report, and eventually Miles demanded Durham's gun, ID, and badge, which he deposited in an evidence bag. After this, Durham decided to revise the reports because he did not want to "lose everything." J.A. 112. Using a computer terminal in the interrogation room, Durham made the revisions and deletions Miles demanded that he make. After first refusing to return Durham's service weapon, ID, and badge, Miles eventually returned the items to Durham. As Durham left the interrogation room (after more than two hours) Miles "patted [Durham] on the back, and . . . said [Durham] was a good boy, a good guy, and that none of this happened." J.A. 114. SCSO supervisors gave Durham the afternoon off with pay and he went home, emotionally and psychologically shaken by the experience.[8]

Within days after his interrogation, Durham filed an internal grievance with his superiors, requesting an outside investigation into the matter. On the same day that Durham filed his grievance, Appellant, Sheriff Robert N. Jones, demoted him from DFC to Deputy. On September 10, 2008, Durham was suspended with pay pending further investigation. The parties spar over

---

[8] Durham testified that he was so disturbed by the experience in the interrogation room that he could not pin his badge back on his uniform shirt when Miles returned it; Miles had to do it for him.

the precise circumstances and sequence of events surrounding the means Durham originally chose to pursue his grievance. Apparently, Durham first invoked Somerset County human relations remedies, but soon County officials seemingly deferred to proceedings within the purview of the Sheriff's Office.

In any event, after receiving a letter from the County Administrator informing him that the grievance would be investigated by the very officials in the SCSO against whom the grievance had been made in the first place, Durham decided to take proactive measures of a highly public nature. Specifically, he prepared a cover letter to a set of documents, which included a memorandum summarizing the events arising from his August 21, 2008 encounter with the suspect, addressed to his immediate supervisor; his original police report; the deleted follow-up reports; the "false" police report Durham created on the computer during his interrogation by Miles and Nelson; the signed Miranda form; a copy of the grievance Durham filed; and his suspension paperwork. Durham sent this packet of materials to: (1) the Somerset County State's Attorney; (2) the Governor of Maryland; (3) the Police Academy where he had been trained; (4) the Maryland Police Training Commission; and (5) the Maryland State Police. In addition, he sent the packet to a number of media outlets, such as the local newspaper, The Daily

10

<u>Times</u> of Salisbury, Maryland, and two local television stations, WBOC TV 16 and Fox 21 News.

In the correspondence to which the internal SCSO documents were attached, Durham stated that he believed Sheriff Jones and others had "broke public trust and abused their power." J.A. 141. Durham testified that he sent these materials to the news media "to expose and to alert the public . . . on what had taken place involving falsifying reports, deleting reports, placing false charges on an innocent person, violating county policy, violating my rights, me being assaulted." J.A. 143. Durham explained that he sent these materials to the Maryland State Police because they are an "independent, unbiased, outside law enforcement agency. And as a citizen, I was making a complaint. I was the victim in a complaint and of a crime." J.A. 144.

Durham continued to send these materials to various political officials, including a Senator in Virginia, until Jones issued a "gag order" against him on September 28, 2008. Durham testified, and Jones agreed, that in the internal SCSO documents, Durham did not reveal any confidential interrogation methods, special police tactics, or the identity of any confidential informants. During the ensuing internal investigation, Durham told investigators that he had sent out these materials "to expose and to alert the public of the corruption that had taken place." J.A. 157.

11

In May 2009, Durham was departmentally charged pursuant to the Law Enforcement Officers' Bill of Rights ("the LEOBR"), Md. Code, Pub. Safety § 3-101, et seq. (West 2013), with assorted misconduct, including dissemination of departmental information and unbecoming conduct.[9] In July 2009, the LEOBR Trial Board, consisting of three law enforcement commanders from other counties, conducted a two-day evidentiary hearing on the charges. The Trial Board acquitted Durham of all the charges except the two relating to the dissemination of information outside the agency without authorization. The Trial Board recommended a punishment of five days' suspension for each charge, totaling ten days' suspension. Jones initially recommended a penalty of thirty days' suspension for each of the charges, totaling sixty days' suspension.

After the Trial Board issued its decision, Jones sent a letter to Durham, informing him that, pursuant to the LEOBR, he (Jones) was considering a possible increase in the sanction. He invited Durham to appear for a penalty hearing on September 16, 2009. The day after Durham and his attorney appeared before

---

[9] Other charges included failure to obey a lawful order, failure to show respect for a fellow employee, failure to be courteous to the public, failure to carry out responsibilities in a competent manner, failure to take appropriate action, submission of a false report, use of excessive force, and failure to conform to law.

Jones for the penalty consideration, Durham received notice of his termination.

                                II.

Durham sued Jones in his individual capacity under 42 U.S.C. § 1983, alleging that he was terminated in retaliation for exercising his free speech rights under the First Amendment.[10] Jones moved to dismiss Durham's case under Federal Rule of Civil Procedure 12(b)(6) on grounds of qualified immunity. The district court denied the motion and the case went to trial.

Durham and Jones both testified at length. Durham testified to the incidents leading up to his termination, including his interactions with Jones and Miles. Jones explained that he terminated Durham's employment because Durham had "undermined the Sheriff's office . . . . [Durham's public disclosures were] full of all kinds of comments about people in my office, me, and everybody else. We were a joke. It was an embarrassment. We spent time tracking down witnesses . . . it was just a nuisance[.]" J.A. 304-05. Jones also testified that if Durham had not disseminated the information he did, he "probably" would not have been terminated. J.A. 314. Jones testified that he felt

---

[10] Additional claims Durham asserted against Jones and against other defendants are not before us in this appeal.

13

that Durham had "stabbed [him] in the back," and that Durham's allegations amounted to calling him a "crook." J.A. 348.

After Durham presented his case, Jones moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), again on grounds of qualified immunity. The district court denied the motion. Jones did not present an affirmative case, and the matter was submitted to the jury. The jury found in favor of Durham, awarding him $1,112,200 in combined economic and non-economic damages.

Jones timely renewed his motion for judgment pursuant to Federal Rule of Civil Procedure 50(b), once again presenting arguments on qualified immunity. The district court denied the motion. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

### III.

We review a district court's denial of a Rule 50(b) motion de novo. Sloas, 616 F.3d at 380. As to qualified immunity, as with any claim or defense, we view the evidence adduced at trial "in the light most favorable to the prevailing party," id., and, in circumstances such as those here, we reverse only if "the evidence favoring the [plaintiff] is [not] legally sufficient to overcome the defense." Ortiz v. Jordan, 131 S. Ct. 884, 889 (2011). In our de novo review of the denial of qualified

14

immunity on the record here, we are mindful of the Supreme

Court's recent admonishment:

> Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary judgment motion. A qualified immunity defense, of course, does not vanish when a district court declines to rule on the plea summarily. The plea remains available to the defending officials at trial; but at that stage, the defense must be evaluated in light of the character and quality of the evidence received in court.

Id.

IV.

Jones contends that he is entitled to qualified immunity, which shields government officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (citing Saucier v. Katz, 533 U.S. 194, 206 (2001)). "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." Meyers v. Baltimore Cnty., Md., 713 F.3d 723, 731 (4th Cir. 2013). "To prevail under qualified immunity, [Jones] has to show either that there was no constitutional violation or that the right violated was not clearly established." Gregg v. Ham, 678 F.3d 333, 341 n.7 (4th Cir. 2012) (citing Henry, 652 F.3d at 531). Jones argues first that there was no violation of Durham's First Amendment rights, and second, even if there was a violation, the

15

right was not clearly established. We consider each issue in turn.

A.

Jones contends that it was not a violation of Durham's First Amendment rights to terminate him for his publication of documents from Durham's internal grievance proceedings. If he is correct, then he is entitled to qualified immunity. Chavez v. Martinez, 538 U.S. 760, 766 (2003) (plurality opinion) ("In deciding whether an officer is entitled to qualified immunity, we must first determine whether the officer's alleged conduct violated a constitutional right . . . . If not, the officer is entitled to qualified immunity.") (internal citations omitted).

We evaluate the exercise of First Amendment rights by public employees differently from their exercise by other citizens; we must balance the interests of an employee who, as a citizen, comments upon matters of public concern, on the one hand, and the interests of a governmental employer, which must maintain an effective workplace, on the other. Connick v. Myers, 461 U.S. 138, 142 (1983) (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). To determine if a public employee has a cognizable First Amendment claim for retaliatory discharge, we apply a three-part test:

> First, we consider whether the public employee was
> speaking as a citizen upon a matter of public concern
> or as an employee about a matter of personal interest.

16

> Second, even if the employee spoke upon a matter of public concern, we must determine whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in managing the working environment. And finally, if the employee's claim satisfies both of these legal criteria, the court turns to the factual question of whether the employee's speech was a substantial factor in the employee's termination decision.

Brooks v. Arthur, 685 F.3d 367, 371 (4th Cir. 2012) (internal citations and quotation marks omitted).

Jones does not dispute that Durham's speech was a substantial factor in his decision to terminate Durham's employment. Thus, we are concerned solely with the first two prongs of Durham's retaliation claim.

Matter of Public Concern

Jones first argues that Durham's speech was not on a matter of public concern, as he was simply publicizing his internal grievances. The trial record does not bear out Jones' contention.

The Supreme Court has instructed courts to look to the "content, form, and context of a given statement" to determine whether it addresses a matter of public concern. Connick, 461 U.S. at 147-48. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." Kirby v. City of Elizabeth City, 388 F.3d 440, 446 (4th Cir. 2004). This does not include "personal complaints and grievances about conditions of employment." Campbell v.

17

Galloway, 483 F.3d 258, 267 (4th Cir. 2007) (citing Stroman v. Colleton Cnty. Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992)). While Jones is correct that personal grievances are not matters of public concern, he mischaracterizes Durham's actions and misapprehends the focus of Durham's communications to public officials and the media.

As the district court correctly ruled, Durham is not claiming First Amendment protection for the materials he filed in the internal grievance proceedings (including the attachments to his letters), or for his filing of an internal grievance. Rather, Durham is claiming First Amendment protection for his publicizing of those materials in connection with his overarching allegations of serious and pervasive law enforcement misconduct in the SCSO. To be sure, it cannot be denied on this record that the misconduct alleged came to light mainly because, or perhaps only because, Durham himself became a victim of the misconduct. Nevertheless, that circumstance does not undermine the conclusion that his allegations rose to the level of speech on a matter of public concern. We have no hesitation in holding that the trial evidence amply supported the district court's determination that the content of Durham's communication strongly militated in favor of finding it was on a matter of public concern.

18

Unlike in Connick, Durham did in fact "seek to inform the public," 461 U.S. at 148, of how his superiors were instructing him to revise his reports in a way that he, as the only percipient witness to the events, knew and believed to be false. Durham sought "to bring to light actual or potential wrongdoing," id., on the part of his superiors, calling for an external investigation and media coverage. In his explanatory letter included with the other materials, Durham outlined the circumstances of his superiors asking him to falsify police reports and submit unwarranted charges against the suspect in the August 21, 2008 incident, on the unmistakable pretextual basis that doing so would pretermit a citizen complaint or a damages lawsuit. As we held in Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992), "an allegation of evidence tampering by a high-ranking police officer is a matter in which the public should be interested." Durham was disturbed by the misconduct he saw in the SCSO, and which he experienced first-hand, and he felt that it needed public attention in order to be remedied.[11]

---

[11] At oral argument before us, Jones argued strenuously that Durham was simply mistaken in his belief that he lacked probable cause to place charges against the suspect, and that his supervisors were entitled to take corrective action. We need not and do not venture into that thicket. If the supervisory officials in the SCSO genuinely believed that, despite his many years of law enforcement experience, Durham required additional or remedial training, then clearly that avenue was open to them. What was not shielded from public scrutiny, however, were (Continued)

19

In addition to the content of his statements, the form and context of their dissemination confirm that they were on a matter of public concern. Durham did not keep the written materials internal, but instead sent them to a broad audience: state and law enforcement offices including the Somerset County State's Attorney, the Governor of Maryland, the Police Academy, the Maryland Police Training Commission, the Maryland State Police, as well as a number of media outlets, such as The Daily Times of Salisbury, Maryland, WBOC TV 16, and Fox 21 News. As an insider in the SCSO, Durham was uniquely positioned to have knowledge of its practices. Moreover, Jones testified that if the SCSO engaged in a cover-up, the public would be "concerned" and "upset," J.A. 290, and noted that he had given at least one interview to the news media about Durham's termination. The fact that the issue was one which interested the media indicates that it was of public interest, as we noted in Robinson v. Balog, 160 F.3d 183 (4th Cir. 1998). There, we found that statements made at a public meeting were protected speech, and a factor in our consideration was that the meeting led to local press coverage. Id. at 188-89.

---

aggressive and corrupt attempts to ward off lawsuits through the falsification of law enforcement records.

In sum, the district court correctly concluded, as a matter of law, see Connick, 461 U.S. at 148 n.7, that Durham's communications were on a matter of public concern, given their content, form, and context.

Balancing Speech Rights Against Effective Work Environment

Jones argues that even if Durham was addressing a matter of public concern, the SCSO's interest in maintaining an efficient and effective law enforcement agency outweighed Durham's rights under the First Amendment.[12] Again, however, we discern no substantial evidence in the trial record supporting this claim.

---

[12] Durham argues, unpersuasively, that Jones is generally estopped from arguing the reasonableness of his decision to terminate Durham, as the Maryland Court of Special Appeals has ruled that the termination decision was "arbitrary and capricious." Durham v. Jones, No. 1382, at *16 (Md. Ct. Sp. App. Aug. 1, 2012) (unreported). This argument badly misses the mark. Durham sought judicial review of Sheriff Jones' administrative decision in the Circuit Court for Somerset County pursuant to the provisions of the LEOBR. Although the lower court sustained the Sheriff's decision to terminate Durham, finding that he had not deviated from the discretion granted to him by statute, the Court of Special Appeals reversed, holding that the Sheriff's decision to increase Durham's penalty from a ten-day suspension to termination was "so extreme and egregious that it constituted an arbitrary and capricious action." Id. at *16. The court's decision did not, however, examine whether the Sheriff had violated Durham's First Amendment rights; in fact, the court expressly declined to review the termination on those grounds, finding that Durham had failed to properly preserve the issue in the trial court. Id.

Durham argues that this decision collaterally estops Jones from "relitigating" whether the decision to terminate Durham was reasonable. Durham mistakes the issue in this appeal. The question before this panel is not whether Jones had sufficient
(Continued)

21

"The efficient functioning of government offices is a paramount public interest." Balog, 160 F.3d at 189. Police are the most restrictive in this regard as they are "paramilitary – discipline is demanded, and freedom must be correspondingly denied." Maciariello, 973 F.2d at 300 (internal quotation marks and citations omitted). We consider a number of factors in determining "the extent to which [the protected speech] disrupts the operation and mission of the agency." McVey v. Stacy, 157 F.3d 271, 278 (4th Cir. 1998).

> Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

---

evidence to justify his termination of Durham in the exercise of his discretion under the LEOBR, as the Court of Special Appeals considered. Rather, the question before this panel is whether, even assuming some sanction could be imposed upon Durham for his dissemination of internal SCSO documents, Jones violated Durham's First Amendment rights by retaliating against him for speaking on a matter of public concern, under circumstances in which Durham's interest outweighed the Sheriff's interest in an efficient and orderly law enforcement agency. There has been no "relitigation" of that issue, which the Court of Special Appeals specifically declined to review.

Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 317 (4th Cir. 2006) (citing McVey, 157 F.3d at 278).

Tellingly, Jones presented no evidence at trial of any actual disruption in the SCSO resulting from Durham's communications, other than vague references to Durham's actions "undermining the public trust." J.A. 316. While Jones is correct that "concrete evidence" of an actual disruption is not required, there must still be a reasonable apprehension of such a disruption. Maciariello, 973 F.2d at 300. At trial, Jones paid lip service to ostensible damage to office morale, relationships between colleagues, and the function of the office generally, but he was unable to articulate any way in which the office would have been different or was actually different due to Durham's statements. Had Jones imposed the relatively brief (ten-day) suspension recommended by the LEOBR Trial Board, there is evidence in the record that deputies and supervisors in the SCSO were still amenable to working with Durham, including Jones himself, who had actually rehired Durham when he had earlier left the SCSO for what he thought might be a better opportunity, only to return to the SCSO.

It is useful to compare this situation with the one in Stroman, 981 F.2d at 152. In Stroman, a teacher wrote letters to his colleagues regarding wage grievances and proposed a "sick-out" during exam week to send a message to administrators. Id.

23

at 158-59. The potential for disruption in such a situation is obvious: the school could not be functional without its teachers, who are essential in providing its services. In contrast, when Jones was asked whether Durham's actions "hamper[ed] the ability of the Somerset County Sheriff's Office to protect the public," Jones responded he "[didn't] know, but [he] wouldn't think so." J.A. 318.

This is not to say that there was no impact felt in the SCSO whatsoever. Jones testified that officers had to spend time on the investigation, and there was office conversation about Durham and the entire incident. But it is not enough that there is some disruption; the amount of disruption has to outweigh the importance of the speech and its concern to the public. See Connick, 461 U.S. at 152; see also McVey, 157 F.3d at 279 (Murnaghan, J., concurring) ("A stronger showing of public interest in the speech requires a concomitantly stronger showing of government-employer interest to overcome it.").

Whatever artful affidavits might have suggested at summary judgment, we examine here the trial record, not a hypothetical rumination on what could have or might have transpired. See Ortiz, 131 S. Ct. at 889. Serious, to say nothing of corrupt, law enforcement misconduct is a substantial concern that must be met with a similarly substantial disruption in the calibration of the controlling balancing test. Given Jones' inability to

24

show at trial how Durham's actions had an adverse impact on the proper functioning of the SCSO in some serious manner, the balance between Durham's rights as a private citizen under the First Amendment and Jones' interest in ensuring an efficient and effective work environment tilts heavily in favor of Durham and his entitlement to enjoy protected speech. Accordingly, we find that the district court was right to conclude, on the present record, that Durham's interests outweighed those on the other side; Durham proved, as the jury found, that he suffered a constitutional injury.

B.

Having found that Jones violated Durham's First Amendment rights, we must now look to whether, at the time of Durham's termination, Durham's rights were "clearly established" such that a "reasonable person would have known" the termination of his employment would be violative of the First Amendment. Ridpath, 447 F.3d at 313. "[A] constitutional right is clearly established when 'its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).

Jones argues that the right in question here was not clearly established because there was not a bright line rule to address Durham's situation, and there is "scant guidance on the

25

boundaries of public employee speech rights" in the Fourth Circuit. App. Br. 32. Jones is incorrect. We have been clear that where public employees are speaking out on government misconduct, their speech warrants protection. Balog, 160 F.3d at 189. Of course, not every situation involving a government employee speaking about some workplace dispute qualifies – as we pointed out in Balog. Id. at 189-90. But just as in Balog, the situation here is "no ordinary workplace dispute." Id. at 190. Nor is this a situation in which Durham's accusations were buried in a "rambling" letter full of other incidents and accusations. See Campbell, 483 F.3d at 271 (granting qualified immunity as no reasonable person would have known that a "rambling thirteen-page memo . . . which focused overwhelmingly on personal grievances and vague gripes about fellow officers not being very nice to her, touched on a matter of public concern[.]").

The incidents at issue here rise far above an ordinary workplace dispute. Durham accused several high-ranking law enforcement officials, in positions of authority within the SCSO, of falsifying law enforcement reports and with authorizing aggressive threats against a member of their own agency if he persisted in his opposition to such a practice. As we have indicated above, Durham's honest belief, even if it was a mistaken belief, that his use of force was both justified to

26

assist in the apprehension of the suspect, but (at the same time) did not arise out of any contemporaneous criminal act by the suspect, might call for retraining or some other response from his supervisors. That is their call. But the use of coercion and threats against him as shown in this record and accepted as accurate by the jury goes far beyond such permissible bounds. Durham was being coerced to lie under oath insofar as they demanded that he revise his reports in a way contrary to his honestly-held beliefs; he testified that, as when any law enforcement officer signs a police report, "you're swearing under oath and swearing to God that that's the truth, that's the facts of the case." J.A. 108. This is especially important to the function of law enforcement, as such reports "become a piece of evidence that could later on be used in court to prosecute somebody, to possible even send them to jail, so it has to be truthful and accurate of the facts." Id.

In short, it was clearly established in the law of this Circuit in September 2009 that an employee's speech about serious governmental misconduct, and certainly not least of all serious misconduct in a law enforcement agency, see Andrew v. Clark, 561 F.3d 261, 269 (4th Cir. 2009), is protected. The mere fact that Jones may have had an independent basis to impose some lesser disciplinary sanction on Durham short of outright termination, such as a short suspension from duty, does not

27

muddle the clarity of that legal principle. Jones' arguments to the contrary are unavailing.

                                    V.

For the reasons set forth, the judgment of the district court is

                                              AFFIRMED.