Filed: July 11, 2012

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 10-2271**

1:09-cv-01217-TSE-IDD

———————

TIRE ENGINEERING AND DISTRIBUTION, LLC, d/b/a Alpha Tyre Systems, d/b/a Alpha Mining Systems, a Florida Limited Liability Corporation; JORDAN FISHMAN, an individual; BEARCAT TIRE ARL, LLC, d/b/a Alpha Tire Systems, d/b/a Alpha Mining Systems, a Florida Limited Liability Company; BCATCO A.R.L., INCORPORATED, a Jersey Channels Islands Corporation,

Plaintiffs - Appellees,

v.

SHANDONG LINGLONG RUBBER COMPANY, LTD., a foreign company; SHANDONG LINGLONG TIRE COMPANY, LTD., f/k/a Zhaoyuan Leo Rubber Products Company, Ltd., a foreign company,

Defendants – Appellants,

and

AL DOBOWI, LTD., a foreign limited liability company; AL DOBOWI TYRE COMPANY, LLC, a foreign limited liability company; AL DOBOWI GROUP, a foreign corporation; TYREX INTERNATIONAL, LTD., a foreign limited liability company based in Dubai; TYREX INTERNATIONAL RUBBER COMPANY, LTD., a foreign corporation; QINGDAO TYREX TRADING COMPANY, LTD., a foreign corporation; SURENDER S. KANDHARI, an individual,

Defendants.

———————

**No. 10-2273**

1:09-cv-01217-TSE-IDD

———————

TIRE ENGINEERING AND DISTRIBUTION, LLC, d/b/a Alpha Tyre Systems, d/b/a Alpha Mining Systems, a Florida Limited Liability Corporation; JORDAN FISHMAN, an individual; BEARCAT TIRE ARL, LLC, d/b/a Alpha Tire Systems, d/b/a Alpha Mining Systems, a Florida Limited Liability Company;

BCATCO A.R.L., INCORPORATED, a Jersey Channels Islands Corporation,

Plaintiffs – Appellees,

v.

AL DOBOWI, LTD., a foreign limited liability company; AL DOBOWI TYRE COMPANY, LLC, a foreign limited liability company; TYREX INTERNATIONAL, LTD., a foreign limited liability company based in Dubai; TYREX INTERNATIONAL RUBBER COMPANY, LTD., a foreign corporation,

Defendants – Appellants,

and

SHANDONG LINGLONG RUBBER COMPANY, LTD., a foreign company; SHANDONG LINGLONG TIRE COMPANY, LTD., f/k/a Zhaoyuan Leo Rubber Products Company, Ltd., a foreign company; AL DOBOWI GROUP, a foreign corporation; QINGDAO TYREX TRADING COMPANY, LTD., a foreign corporation; SURENDER S. KANDHARI, an individual,

Defendants.

---

**No. 10-2321**
1:09-cv-01217-TSE-IDD

---

TIRE ENGINEERING AND DISTRIBUTION, LLC, d/b/a Alpha Tyre Systems, d/b/a Alpha Mining Systems, a Florida Limited Liability Corporation; JORDAN FISHMAN, an individual; BEARCAT TIRE ARL, LLC, d/b/a Alpha Tire Systems, d/b/a Alpha Mining Systems, a Florida Limited Liability Company; BCATCO A.R.L., INCORPORATED, a Jersey Channels Islands Corporation,

Plaintiffs – Appellants,

v.

AL DOBOWI, LTD., a foreign limited liability company; AL DOBOWI TYRE COMPANY, LLC, a foreign limited liability company; TYREX INTERNATIONAL, LTD., a foreign limited liability company based in Dubai; TYREX INTERNATIONAL RUBBER COMPANY, LTD., a foreign corporation; SHANDONG

2

LINGLONG TIRE COMPANY, LTD., f/k/a Zhaoyuan Leo Rubber Products Company, Ltd., a foreign company; SHANDONG LINGLONG RUBBER COMPANY, LTD., a foreign company,

     Defendants – Appellees,

   and

AL DOBOWI GROUP, a foreign corporation; QINGDAO TYREX TRADING COMPANY, LTD., a foreign corporation; SURENDER S. KANDHARI, an individual,

     Defendants.

--------------------

O R D E R

--------------------

The Court amends its opinion filed June 6, 2012, as follows:

On page 37, line 1, the sentence beginning "We affirm" is changed to read "Finally, we affirm," and the final sentence of the majority opinion on page 37, lines 3 through 6, is deleted.

      For the Court – By Direction

       /s/ Patricia S. Connor
         Clerk

3

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TIRE ENGINEERING AND
DISTRIBUTION, LLC, d/b/a Alpha
Tyre Systems, d/b/a Alpha Mining
Systems, a Florida Limited
Liability Corporation; JORDAN
FISHMAN, an individual; BEARCAT
TIRE ARL, LLC, d/b/a Alpha Tire
Systems, d/b/a Alpha Mining
Systems, a Florida Limited
Liability Company; BCATCO
A.R.L., INCORPORATED, a Jersey
Channels Islands Corporation,

　　　　*Plaintiffs-Appellees,*

　　　　　　v.

SHANDONG LINGLONG RUBBER
COMPANY, LTD., a foreign
company; SHANDONG LINGLONG
TIRE COMPANY, LTD., f/k/a
Zhaoyuan Leo Rubber Products
Company, Ltd., a foreign
company,

　　　　*Defendants-Appellants,*

　　　　　　and

No. 10-2271

AL DOBOWI, LTD., a foreign limited
liability company; AL DOBOWI
TYRE COMPANY, LLC, a foreign
limited liability company; AL
DOBOWI GROUP, a foreign
corporation; TYREX INTERNATIONAL,
LTD., a foreign limited liability
company based in Dubai; TYREX
INTERNATIONAL RUBBER COMPANY,
LTD., a foreign corporation;
QINGDAO TYREX TRADING
COMPANY, LTD., a foreign
corporation; SURENDER S.
KANDHARI, an individual,

*Defendants.*

TIRE ENGINEERING AND
DISTRIBUTION, LLC, d/b/a Alpha
Tyre Systems, d/b/a Alpha Mining
Systems, a Florida Limited
Liability Corporation; JORDAN
FISHMAN, an individual; BEARCAT
TIRE ARL, LLC, d/b/a Alpha Tire
Systems, d/b/a Alpha Mining
Systems, a Florida Limited
Liability Company; BCATCO
A.R.L., INCORPORATED, a Jersey
Channels Islands Corporation,

*Plaintiffs-Appellees,*

No. 10-2273

v.

AL DOBOWI, LTD., a foreign limited liability company; AL DOBOWI TYRE COMPANY, LLC, a foreign limited liability company; TYREX INTERNATIONAL, LTD., a foreign limited liability company based in Dubai; TYREX INTERNATIONAL RUBBER COMPANY, LTD., a foreign corporation,

*Defendants-Appellants,*

and

SHANDONG LINGLONG RUBBER COMPANY, LTD., a foreign company; SHANDONG LINGLONG TIRE COMPANY, LTD., f/k/a Zhaoyuan Leo Rubber Products Company, Ltd., a foreign company; AL DOBOWI GROUP, a foreign corporation; QINGDAO TYREX TRADING COMPANY, LTD., a foreign corporation; SURENDER S. KANDHARI, an individual,

*Defendants.*

TIRE ENGINEERING AND
DISTRIBUTION, LLC, d/b/a Alpha
Tyre Systems, d/b/a Alpha Mining
Systems, a Florida Limited
Liability Corporation; JORDAN
FISHMAN, an individual; BEARCAT
TIRE ARL, LLC, d/b/a Alpha Tire
Systems, d/b/a Alpha Mining
Systems, a Florida Limited
Liability Company; BCATCO
A.R.L., INCORPORATED, a Jersey
Channels Islands Corporation,

*Plaintiffs-Appellants,*

v.

AL DOBOWI, LTD., a foreign limited
liability company; AL DOBOWI
TYRE COMPANY, LLC, a foreign
limited liability company; TYREX
INTERNATIONAL, LTD., a foreign
limited liability company based in
Dubai; TYREX INTERNATIONAL
RUBBER COMPANY, LTD., a foreign
corporation; SHANDONG LINGLONG
TIRE COMPANY, LTD., f/k/a
Zhaoyuan Leo Rubber Products
Company, Ltd., a foreign
company; SHANDONG LINGLONG
RUBBER COMPANY, LTD., a foreign
company,

*Defendants-Appellees,*

No. 10-2321

and

AL DOBOWI GROUP, a foreign corporation; QINGDAO TYREX TRADING COMPANY, LTD., a foreign corporation; SURENDER S. KANDHARI, an individual,

*Defendants.*

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, III, Senior District Judge. (1:09-cv-01217-TSE-IDD)

Argued: December 7, 2011

Decided: June 6, 2012

Before SHEDD, DIAZ, and FLOYD, Circuit Judges.

Affirmed in part, reversed in part, and vacated in part by published per curiam opinion. Judge Diaz wrote an opinion dissenting in part.

## COUNSEL

**ARGUED:** Richard Douglas Klingler, SIDLEY AUSTIN LLP, Washington, D.C.; Howard Marc Radzely, MORGAN LEWIS & BOCKIUS LLP, Washington, D.C., for Shandong Linglong Rubber Company, Ltd., Shandong Linglong Tire Company, Ltd., Al Dobowi, Ltd., Al Dobowi Tyre Company, LLC, TyreX International, Ltd., and TyreX International Rubber Company, Ltd. William Edgar Copley, WEISBROD

MATTEIS COPLEY, PLLC, Washington, D.C., for Tire Engineering and Distribution, LLC, Jordan Fishman, Bearcat Tire ARL, LLC, and Bcatco ARL, Incorporated. **ON BRIEF:** Peter D. Keisler, James C. Owens, Jr., Bryson Love Bachman, SIDLEY AUSTIN LLP, Washington, D.C., for Al Dobowi, Ltd., Al Dobowi Tyre Company, LLC, TyreX International, Ltd., and TyreX International Rubber Company, Ltd.; R. Ted Cruz, William S. W. Chang, Shelly M. Doggett, MORGAN LEWIS & BOCKIUS LLP, Washington, D.C., for Shandong Linglong Rubber Company, Ltd., and Shandong Linglong Tire Company, Ltd. August J. Matteis, Jr., GILBERT LLP, Washington, D.C., for Tire Engineering and Distribution, LLC, Jordan Fishman, Bearcat Tire ARL, LLC, and Bcatco ARL, Incorporated.

---

## OPINION

PER CURIAM:

Alpha,[1] a domestic producer of mining tires, sued Al Dobowi[2] and Linglong,[3] foreign corporations. Alpha alleged that the defendants conspired to steal its tire blueprints, produce infringing tires, and sell them to entities that had formerly purchased products from Alpha. A jury found in favor of Alpha on all claims submitted to it, awarding the company $26 million in damages. The district court upheld the damages award against the defendants' post-trial challenges. Al

---

[1]By "Alpha," we refer collectively to Tire Engineering & Distribution, LLC; Bearcat Tire ARL, LLC; Bcatco A.R.L., Inc.; and Jordan Fishman.

[2]By "Al Dobowi," we refer collectively to Al Dobowi, Ltd.; Al Dobowi Tyre Co., LLC; TyreX International, LTD.; and TyreX International Rubber Co. Ltd. Al Dobowi is domiciled in the United Arab Emirates.

[3]By "Linglong," we refer collectively to Shandong Linglong Rubber Co., Ltd.; and Shandong Linglong Tire Co., Ltd. Linglong is domiciled in China.

Dobowi and Linglong appeal, contesting the verdict and the district court's exercise of personal jurisdiction.

We initially hold that the district court properly exercised jurisdiction over Al Dobowi and Linglong. We affirm the district court's judgment that Al Dobowi and Linglong are liable to Alpha under the Copyright Act and for conversion under Virginia law, but we dismiss the remaining theories of liability submitted to the jury. We affirm the jury's damages award.[4] As a final matter, we vacate the district court's award of attorneys' fees.

## I.

## A.

Because the jury returned a verdict in favor of Alpha, we view the evidence in the light most favorable to that party, giving it the benefit of all inferences. *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991). Any factual findings made by the district court are subject to clear-error review. *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 (4th Cir. 2009).

Alpha develops and sells specialized tires for underground mining vehicles. Prior to 2005 and the events giving rise to this suit, Alpha flourished in the mining-tire market with its unique and effective designs. To protect its intellectual property and brand, Alpha obtained copyrights for its designs and a trademark for its "Mine Mauler" product name. Alpha also closely guarded its blueprints, as with these in hand any manufacturer could copy the company's distinctive tires and jeopardize its market position.

---

[4]Alpha noted a cross appeal challenging the dismissal of its Virginia statutory conspiracy claim only in the event that we vacated the damages award. In accordance with Alpha's position, because we affirm the damages award, we do not reach its cross appeal.

In May 2005, John Canning, a former employee of Alpha, organized a meeting at a hotel in Richmond, Virginia. Canning invited Sam Vance, an employee of Alpha; and Surender Kandhari, the chairman of defendant Al Dobowi, to attend and discuss prospects for Al Dobowi's entry into the mining-tire business. Vance offered to supply Al Dobowi with Alpha's blueprints, customer list, and cost information. The three men discussed the possibility of Al Dobowi's using this information to produce and sell a line of mining tires that copied Alpha's designs and challenged its place in the tire market.

Following the meeting, Vance began working from his home in Tazewell, Virginia on a business plan, which anticipated selling tires in both the United States and abroad. Kandhari received Vance's business plan, at which point he formally welcomed Vance to Al Dobowi. Kandhari explained that he "want[ed] [Vance] on board" and "definitely expect[ed] [him] to be full time committed in developing business." J.A. 1367. Kandhari proposed that Vance take a position with Al Dobowi as the "Business Development Director for an AL DOBOWI group company based in the USA." *Id.* Throughout their correspondence that summer, Vance and Kandhari referred to Vance's Virginia home as a satellite office of Al Dobowi.

With the blueprints in their possession, Vance, Kandhari, and Canning set out to find a tire manufacturer to produce mining tires based on Alpha's designs. They found a willing partner in Linglong, and by the end of that summer Linglong had agreed to manufacture a range of mining tires pursuant to Alpha's blueprints. From the beginning of the relationship, Linglong knew that the blueprints had been stolen. In a September email, Vance and a Linglong representative discussed taking steps to slightly modify their tires to make it less obvious that they had copied Alpha's designs. Linglong further recognized that Vance was performing work from his office

in Virginia. Indeed, in that same email Vance noted that he had been modifying the designs from his Tazewell office.

Their relationship having been formalized, Al Dobowi and Linglong began the manufacturing process. Linglong produced a range of mining tires based on Alpha's designs. Al Dobowi began to sell the tires in early 2006 under the name Infinity. Al Dobowi convinced Sandvik, one of the largest manufacturers of underground mining equipment, to purchase tires from it instead of Alpha. By July 2006, Vance had abandoned his Virginia office and moved permanently to China.

During the winter of 2006, Jordan Fishman, founder and CEO of Alpha, began to suspect that Vance had stolen Alpha's blueprints and given them to Al Dobowi. Fishman saw an Infinity tire catalogue, which featured products almost identical to Alpha's. He confirmed his suspicions at a trade show in the fall of 2006, where he saw the Infinity tires up close and was struck by their similarity to Alpha's line of tires.

## B.

On October 28, 2009, Alpha filed suit against Al Dobowi and Linglong.[5] Alpha's amended complaint included nine counts arising out of Al Dobowi and Linglong's conversion of its blueprints and sale of infringing tires.

Al Dobowi and Linglong ("Appellants") first moved to dismiss the action for lack of personal jurisdiction. The district court denied the motion, stating in open court that "there is a

---

[5]Alpha filed separate suits against Al Dobowi and Linglong, respectively, but the district court consolidated the two suits soon after filing. The consolidated suit and Alpha's cross appeal were consolidated for purposes of this appeal. Alpha in its complaint named other persons as defendants, but the entities enumerated in footnotes 2 and 3 are the only defendants that remain in the case on appeal.

prima facie basis for showing personal jurisdiction." J.A. 143. Appellants then moved for summary judgment on all claims. The district court granted the motion as to four of the nine claims raised by Alpha. With regard to the remaining counts, the court dismissed all claims barred by the applicable statutes of limitations. Relevant here, the court dismissed all claims under the Copyright Act that accrued prior to October 28, 2006. It also dismissed in its entirety Alpha's claim under the Virginia business-conspiracy statute, Va. Code Ann. §§ 18.2-499 to 500, finding it barred by Virginia's two-year statute of limitations governing actions for personal injuries.

The parties proceeded to a jury trial. Alpha presented evidence establishing that Al Dobowi and Linglong had conspired to steal its blueprints and use them to manufacture infringing tires, which they then sold to Alpha's former customers. Alpha's damages expert testified that the company had suffered $36 million in damages as a result of Appellants' unlawful acts.

The court submitted five counts to the jury: (1) violation of the federal Copyright Act, 17 U.S.C. § 101 *et seq.*; (2) violation of the federal Lanham Act, 15 U.S.C. § 1051 *et seq.*, as to registered trademarks; (3) violation of the Lanham Act as to unregistered trademarks; (4) common-law conversion; and (5) common-law civil conspiracy. Important to our disposition, the court instructed the jury as follows on the Copyright Act claim:

> [C]opyright laws generally do not apply to infringement that occurs outside of the United States. However, if you find that plaintiffs proved that the infringing acts outside of the United States were a consequence or result of predicate infringing acts that occurred inside the United Stated [sic], then you may consider those infringing acts that occurred outside the United States.

J.A. 1107–08. If the jury found in favor of Alpha on the copyright claim, the court instructed it to award damages equal to Appellants' total profit attributable to the infringement.

The jury returned a verdict in favor of Alpha on all counts, awarding it $26 million in damages. Because the jury found that Appellants were engaged in a conspiracy, Appellants were adjudged jointly liable for the total damages award.

Appellants first contested the verdict in a Rule 50(b) renewed motion for judgment as a matter of law. The district court upheld the verdict in part and sustained the damages award. First, the court reiterated that it properly exercised personal jurisdiction over Appellants. Moving to the merits, it found unavailing Appellants' challenges to liability under the conversion, conspiracy, and Copyright Act claims. Appellants' contentions regarding the validity of the Lanham Act claims fared better. Holding that Alpha presented insufficient evidence to support a finding of liability on the majority of its trademark claims, the court dismissed Alpha's registered-trademark claim in its entirety and upheld its unregistered-trademark claim as to only two of eleven marks. Finally, the court ruled that the jury's damages award was reasonable.

Appellants then filed a Rule 59 motion for a new trial, arguing principally that the damages award was unsustainable in view of the court's dismissal of the majority of Alpha's trademark claims, on which the jury may have relied in calculating damages. The district court denied the motion. The court reasoned that the measure of damages was the same for all counts, and dismissal of some claims did not disturb the overall award because the remaining claims supported the award in full.

In a later order, the court awarded Alpha $632,377.50 in attorneys' fees, concluding that Appellants' violation of the Lanham Act provided the sole basis for the award.

This appeal followed.

## II.

We first consider Appellants' challenge to the district court's exercise of personal jurisdiction over them. We review de novo whether the district court possessed jurisdiction, though the court's factual findings are reviewed for clear error. *CFA Inst.*, 551 F.3d at 292. Characterizing their contacts with the forum state as negligible, Appellants contend that the Fourteenth Amendment's Due Process Clause protects them from being forced to litigate in Virginia.

Appellants' argument is unavailing. Evidence presented at trial and the district court's factual findings establish specific jurisdiction over Appellants.[6] Both Al Dobowi and Linglong possessed sufficient contacts with Virginia such that the district court's exercise of personal jurisdiction was consistent with the demands of due process.

## A.

A lawful assertion of personal jurisdiction over a defendant requires satisfying the standards of the forum state's long-arm statute and respecting the safeguards enshrined in the Fourteenth Amendment's Due Process Clause. *CFA Inst.*, 551 F.3d at 292. If a potential exercise of jurisdiction comports with the state's long-arm statute, the Constitution "requires that the defendant have sufficient minimum contacts with the forum state." *Id.* Because Virginia's long-arm statute extends personal jurisdiction to the outer bounds of due process, the two-

---

[6]On December 19, 2011, Alpha submitted a motion to supplement the appellate record with documents purportedly relevant to our jurisdictional analysis. Because we conclude that the evidence presented at trial supports the district court's assertion of personal jurisdiction, we need not consider any materials included in the filing. We accordingly deny the motion as moot.

prong test collapses into a single inquiry when Virginia is the forum state. *Id.* at 293. A Virginia court thus has jurisdiction over a nonresident defendant if the exercise of such jurisdiction is consonant with the strictures of due process.

The Due Process Clause contemplates that a court may assert jurisdiction over a nonresident defendant through either of two independent avenues. First, a court may find specific jurisdiction "based on conduct connected to the suit." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711 (4th Cir. 2002). "If the defendant's contacts with the State are also the basis for the suit, those contacts may establish specific jurisdiction." *Id.* at 712. Second, a court may exercise personal jurisdiction under the theory of general jurisdiction, which requires a more demanding showing of "continuous and systematic" activities in the forum state. *Id.* Alpha argues only that the court possessed specific jurisdiction over Appellants, so our analysis is confined to that model.

Fairness is the touchstone of the jurisdictional inquiry, and the " 'minimum contacts' test is premised on the concept that a corporation that enjoys the privilege of conducting business within a state bears the reciprocal obligation of answering to legal proceedings there." *CFA Inst.*, 551 F.3d at 293. In the context of specific jurisdiction, "the relevant conduct [must] have [only] such a connection with the forum state that it is fair for the defendant to defend itself in that state." *Id.* at 292 n.15. We do more than formulaically count contacts, instead taking into account the qualitative nature of each of the defendant's connections to the forum state. In that vein, "a single act by a defendant can be sufficient to satisfy the necessary 'quality and nature' of such minimal contacts, although 'casual' or 'isolated' contacts are insufficient to trigger" an obligation to litigate in the forum. *Id.* at 293 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317–18 (1945)).

We consider three factors when determining whether a court has personal jurisdiction over a nonresident defendant:

(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arise out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable. *Id.* at 294.

*First*, we must conclude that a nonresident defendant purposefully availed itself of the privilege of conducting activities in the forum state to authorize the exercise of personal jurisdiction over the defendant. The purposeful-availment test is flexible, and our analysis proceeds on a case-by-case basis. Through our recent decisions we can glean a basic outline of the doctrine.

We have found purposeful availment where a defendant substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute. In *CFA Institute*, we noted that the defendant contacted the plaintiff, which "sparked ongoing business transactions, by which [defendant] repeatedly reached into Virginia to transact business with [plaintiff], invoking the benefits and protections of Virginia law." *Id.* at 295. In particular, a representative of the defendant visited the plaintiff's office in the forum state, after which the parties substantially corresponded and collaborated from afar. *Id.* at 294–95. Where such minimum contacts are present, that the defendant did not initiate the contacts does not bar a judicial finding of purposeful availment. *Christian Science Bd. of Dirs. v. Nolan*, 259 F.3d 209, 216 (4th Cir. 2001).

In contrast, we have determined that purposeful availment was lacking in cases in which the locus of the parties' interaction was overwhelmingly abroad. We dismissed both defendants from the action in *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273 (4th Cir. 2009), finding that neither had purposefully availed itself of the privilege of conducting activities in Virginia, the forum state. One defendant maintained no offices, conducted no ongoing business, and

made no in-person contact with the plaintiff in the forum state. *Id.* at 279–80. Though the defendant discussed entering an agreement with a Virginia resident, any work contemplated would have been performed in India and no agreement was ever executed. *Id.* at 280. Moreover, the activity giving rise to the claim occurred in India, not Virginia. *Id.* "On these facts," we wrote, "[defendant's] contact with Virginia was simply too attenuated to justify the exercise of personal jurisdiction." *Id.* The second defendant similarly lacked sufficient contacts with the forum state. It, too, maintained no offices in Virginia, and none of its employees had ever traveled there. *Id.* at 281. The activity complained of took place in India, and the alleged conspiracy was hatched outside of the forum state. *Id.* at 282. Although this defendant exchanged four brief emails and had several phone conversations with the Virginia-based plaintiff about contractual negotiations, we concluded that these contacts were qualitatively insufficient to show purposeful availment. *Id.* at 281–82.

A similarly overpowering foreign nexus to the dispute in *Foster v. Arletty 3 Sarl*, 278 F.3d 409 (4th Cir. 2002), militated against a finding of purposeful availment. As in *Consulting Engineers*, we found it important that the defendants in *Foster* had no offices or employees in the forum state. *Id.* at 415. Fairness also factored into our decision, and we reasoned that the dispute's close connection to France—all of the parties to the contracts at issue were French citizens; the contracts were negotiated, drafted, and executed in France; and performance was to take place in France—rendered us unable to conclude that the defendants "should reasonably anticipate being haled into court in South Carolina." *Id.* Given France's centrality to the case, "some fleeting communication by telephone and fax" between the plaintiff and defendants while the plaintiff was in South Carolina was "insufficient, standing alone, to establish jurisdiction." *Id.*; *see also J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2785, 2790 (2011) (plurality) (concluding that court lacked personal jurisdiction over British corporate defendant that "had no office in [the

forum state]; . . . neither paid taxes nor owned property there; . . . neither advertised in, nor sent any employees to, the State" and had never "in any relevant sense targeted the State").

*Second*, with purposeful availment established, we require that the plaintiff's claims arise out of activities directed at the forum state. The analysis here is generally not complicated. Where activity in the forum state is "the genesis of [the] dispute," this prong is easily satisfied. *See CFA Inst.*, 551 F.3d at 295. A plaintiff's claims similarly arise out of activities directed at the forum state if substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim. *See id.* at 295–96.

*Third*, exercise of personal jurisdiction must be constitutionally reasonable. This prong of the analysis "ensures that litigation is not 'so gravely difficult and inconvenient' as to place the defendant at a 'severe disadvantage in comparison to his opponent.' " *Id.* at 296 (quoting *Nolan*, 259 F.3d at 217). The burden on the defendant, interests of the forum state, and the plaintiff's interest in obtaining relief guide our inquiry. *Id.* A corporate defendant's domicile abroad, standing alone, does not render domestic exercise of jurisdiction unduly burdensome. *Id.* In *CFA Institute*, we acknowledged that the defendant's location in India "may present unique challenges" but nevertheless determined that its ability to secure counsel in the forum state and its choice to do business with a forum resident—which also made the prospect of litigation in the state foreseeable—counseled that defending the suit would not be particularly burdensome. *Id.* Virginia moreover maintained a "substantial interest" in resolving the grievances of its businesses, particularly when Virginia law informed some of the claims. *Id.* at 296–97. Finally, the plaintiff had a substantial interest in protecting its intellectual property after having "carved out a market niche by cultivating" its distinctive mark and products. *Id.* at 297.

B.

Though domiciled abroad, both Al Dobowi and Linglong have sufficient contacts with Virginia such that the district court's assertion of personal jurisdiction over them complied with the Fourteenth Amendment's mandate. We examine each defendant's contacts in turn.

1.

By hatching the conspiracy to unlawfully copy Alpha's tires while in Virginia and substantially corresponding with an employee based in Virginia, Al Dobowi purposefully availed itself of the privilege of conducting activities in the forum state. Indeed, Al Dobowi's contacts with Virginia are similar to those deemed sufficient to establish personal jurisdiction in *CFA Institute*. Kandhari, as the chairman of Al Dobowi,[7] met with Vance in Virginia. The conspiracy to copy Alpha's blueprints and sell infringing tires was entered into at this same

---

[7]Al Dobowi maintains that we must establish an independent basis for the lawful exercise of personal jurisdiction over each of the Al Dobowi entities sued in this case. It further suggests that Kandhari's activities were on behalf of only TyreX International, Ltd. and cannot be considered contacts between the other entities and Virginia. We reject Al Dobowi's attempts to convert, for the purpose of this litigation, its freewheeling corporate structure into a rigidly defined set of semi-autonomous bodies. Kandhari considers himself the chairman of all ten or twelve companies within the Al Dobowi Group. The record reflects that there are no hard-and-fast divisions between the various entities. For instance, when asked to describe the structure of Al Dobowi, Kandhari's son testified as follows: "It's a family business, so you work for the family and you help out wherever is necessary, so whenever you're required to do something, you, you work for the family, so you are plugging gaps wherever required whenever required." J.A. 647. He further testified that he is not employed by any particular entity, but instead by "the family." *Id.* Importantly, Al Dobowi pays its employees by drawing a check from whichever entity has available cash. *Id.* 660. We are thus not dealing with independent entities having "discrete status[es] as subsidiaries," *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2857 (2011), and compartmentalized analysis is inappropriate.

meeting in Virginia. As was the case with the defendant's visits to the forum state in *CFA Institute*, which sparked a contractual relationship between the defendant and plaintiff, 551 F.3d at 295, Al Dobowi and Vance's relationship originated in Virginia. And like the defendant in *CFA Institute*, Al Dobowi "repeatedly reached into Virginia to transact business . . . , invoking the benefits and protections of Virginia law," *id.* Al Dobowi employed Vance, a resident of Virginia who maintained an office in Virginia and wielded significant authority within the company. It substantially corresponded with Vance while he was in Virginia, developing a business plan and exchanging thoughts on designs for the Infinity line of tires.

Al Dobowi's contacts with the forum state are far more extensive than those found lacking in *Consulting Engineers* and *Foster*. Whereas the acts giving rise to the disputes in those cases occurred almost exclusively abroad, a substantial nexus exists here between Virginia and Alpha's claims. Unlike the defendants in *Consulting Engineers*, Al Dobowi had an office and employee in the forum state, its representatives traveled to the forum state, and a critical part of the activity of which the plaintiffs complain—conspiring to infringe its intellectual property rights—took place in the forum state. And in contrast to the defendants in *Foster*, Al Dobowi had an office and employee in the forum state, forged an agreement in the forum state, and worked closely with a U.S. citizen. Upon joining the conspiracy and hiring Vance, Al Dobowi thus should have "reasonably anticipate[d] being haled into court in [Virginia]," *Foster*, 278 F.3d at 415.

Alpha's claims moreover arise out of Al Dobowi's contacts directed at Virginia. Again, *CFA Institute* is illustrative. As in that case, Al Dobowi's visit to Virginia "was the genesis of this dispute," *CFA Inst.*, 551 F.3d at 295. And correspondence between Vance, a Virginia resident working in Virginia, and Al Dobowi forms an important part of Alpha's claim, another factor central to our analysis in *CFA Institute*.

Finally, exercise of personal jurisdiction over Al Dobowi is constitutionally reasonable. Al Dobowi, based out of the United Arab Emirates, certainly faced a greater disadvantage litigating in Virginia than do Virginia residents. But this is not dispositive. *See id.* at 296. Al Dobowi, like the defendant in *CFA Institute* over whom jurisdiction was deemed constitutionally reasonable, was able to secure able counsel and should have foreseen the possibility of being forced to litigate in the forum state. Thus Al Dobowi's defense of a suit in Virginia is not particularly burdensome. *See id.* Although the entities that compose Alpha are not Virginia companies, the state has an interest in ensuring that the nation's copyright and trademark laws are not violated within its borders. And, as was the case in *CFA Institute*, Virginia has a particular interest in this dispute because some of the claims are based on the state's law. Alpha, too, has a substantial interest in obtaining relief. Indeed, the jury's award of damages reveals the significant harm visited on Alpha by Al Dobowi's unlawful activities. Like the plaintiff in *CFA Institute*, Alpha has "carved out a market niche by cultivating" a distinctive mark and product line and was entitled to use Virginia's judicial system "to protect and vindicate its intellectual property and other legal rights," *id.* at 297.

## 2.

Although fewer in number, Linglong's contacts with Virginia are qualitatively significant and demonstrate that it, too, purposefully availed itself of the privilege of conducting business in the forum state. As with Al Dobowi, we find that *CFA Institute* controls our jurisdictional inquiry here. To be sure, Linglong lacks some of the contacts found in *CFA Institute*—it has neither offices nor employees in Virginia, and no representative visited Virginia to forge or further the conspiracy. But those contacts were not deemed dispositive in that case. Rather, the defendant's "repeatedly reach[ing] into Virginia to transact business with [plaintiff], invoking the bene-

fits and protections of Virginia law" constituted the core of our jurisdictional holding. *CFA Inst.*, 551 F.3d at 295.

As was the case in *CFA Institute*, Linglong's reaching into the forum state affords a sufficient basis to conclude that the purposeful-availment prong is satisfied. Linglong engaged in extensive collaboration with Vance while he was working from his Virginia office. Vance and a representative from Linglong exchanged ideas about the tire manufacturing process—and, in particular, how best to alter Alpha's designs to make it appear less obvious that they had copied Alpha's blueprints. Vance worked on the drawings from his Virginia office, incorporating Linglong's ideas and responding to its concerns, and ultimately submitting them to Linglong from Virginia. The district court moreover concluded that Linglong knew through its correspondence with Vance "that acts in furtherance of the conspiracy would occur in Virginia," J.A. 1247, and we find no reason to disturb this factual finding on clear-error review. Given its substantively weighty communications with Vance while he was operating out of his Virginia office—covering details of the manufacturing process that forms the gravamen of this dispute—Linglong should have "reasonably anticipate[d] being haled into court in [Virginia]," *Foster*, 278 F.3d at 415.

The qualitative significance of Linglong's contacts sets this case apart from *Consulting Engineers* and *Foster*. That the activity giving rise to the suit took place abroad bolstered our conclusion in *Consulting Engineers* that the court lacked personal jurisdiction over the defendants. Here, in contrast, Vance and Linglong's manipulation of Alpha's blueprints and development of a production plan—which forms a critical part of Alpha's claims—took place while Vance was working in Virginia. And unlike *Foster*, where the defendants had only "fleeting communication" with a resident of the forum state, *id.*, Linglong engaged in substantive deliberations with Vance about the design and manufacturing process. In sum, in contrast to the defendants in *Consulting Engineers* and *Foster*,

Linglong "repeatedly reached into Virginia to transact business with [Vance], invoking the benefits and protections of Virginia law," *CFA Inst.*, 551 F.3d at 295.

Having established that Linglong purposefully availed itself of the privilege of conducting activities in the forum state, we have no trouble concluding that Alpha's claims arise out of Linglong's activities directed at the state. Linglong's correspondence with the Virginia-based Vance was substantial and forms a central part of Alpha's claims, a factor convincing us that this prong of the inquiry is satisfied, *see id.* at 295–96.

Finally, for the same reasons outlined with respect to Al Dobowi, exercise of jurisdiction over Linglong comports with notions of constitutional reasonableness.

### III.

Turning to the merits, Appellants challenge the validity of the jury's verdict on Alpha's copyright, trademark, conversion, and conspiracy claims. We review de novo the district court's rejection of Appellants' arguments. *Sloas v. CSX Transp., Inc.*, 616 F.3d 380, 392 (4th Cir. 2010).

We hold that Alpha has presented an actionable claim under the Copyright Act, and we sustain the jury's liability verdict on that count. Likewise, we sustain the jury's liability determination on Alpha's conversion claim. However, we dismiss Alpha's trademark and conspiracy claims, finding that each lacks merit.

### A.

Appellants first argue that the Copyright Act has no extraterritorial reach. Because the only claims raised by Alpha involve conduct abroad, Appellants maintain that the Copyright Act affords Alpha no remedy. Alternatively, even if the Copyright Act sometimes reaches foreign conduct that flows

from a domestic violation, Appellants urge us to consider that foreign conduct only where, unlike here, the domestic violation is not barred by the Copyright Act's three-year statute of limitations.

We hold that Alpha has presented a cognizable claim under the Copyright Act and therefore uphold the jury's finding of liability on that count. We adopt the predicate-act doctrine, which posits that a plaintiff may collect damages from foreign violations of the Copyright Act so long as the foreign conduct stems from a domestic infringement. No court applying the doctrine has ascribed significance to the timeliness of domestic claims, and we decline to endorse Appellants' proposal that we limit its application to cases where a domestic violation is not time barred.

1.

As a general matter, the Copyright Act is considered to have no extraterritorial reach. *E.g.*, *Nintendo of Am., Inc. v. Aeropower Co.*, 34 F.3d 246, 249 n.5 (4th Cir. 1994). But courts have recognized a fundamental exception: "when the type of infringement permits further reproduction abroad," a plaintiff may collect damages flowing from the foreign conduct. *Update Art, Inc. v. Modin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988).

This predicate-act doctrine traces its roots to a famous Second Circuit opinion penned by Learned Hand. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 52 (2d Cir. 1939). The Second Circuit in *Sheldon* was confronted with an undisputed domestic Copyright Act violation. The defendant had converted the plaintiff's motion picture while in the United States and then exhibited the picture abroad. *Id.* The court was required to decide whether the damages award could include profits made from foreign exhibition of the film. *Id.* Answering the question in the affirmative, Judge Hand articulated the framework of the predicate-act doctrine:

> The Culver Company made the negatives in this country, or had them made here, and shipped them abroad, where the positives were produced and exhibited. The negatives were 'records' from which the work could be 'reproduced,' and it was a tort to make them in this country. The plaintiffs acquired an equitable interest in them as soon as they were made, which attached to any profits from their exploitation, whether in the form of money remitted to the United States, or of increase in the value of shares of foreign companies held by the defendants. . . . [A]s soon as any of the profits so realized took the form of property whose situs was in the United States, our law seized upon them and impressed them with a constructive trust, whatever their form.

*Id.* Once a plaintiff demonstrates a domestic violation of the Copyright Act, then, it may collect damages from foreign violations that are directly linked to the U.S. infringement.

The Second Circuit has reaffirmed the continuing vitality of the predicate-act doctrine. *Update Art*, 843 F.2d at 73. In *Update Art*, the plaintiff owned the rights to distribute and publish a certain graphic art design. *Id.* at 68. Without authorization from the plaintiff, the defendant published the image in an Israeli newspaper. *Id.* at 69. The court reasoned that "the applicability of American copyright laws over the Israeli newspapers depends on the occurrence of a predicate act in the United States." *Id.* at 73. "If the illegal reproduction of the poster occurred in the United States and then was exported to Israel," the court continued, "the magistrate properly could include damages accruing from the Israeli newspapers." *Id.* But if the predicate act of reproduction occurred outside of the United States, the district court could award no damages from newspaper circulation in Israel. *Id.*

More recently, the Ninth Circuit embraced the predicate-act doctrine. *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149

F.3d 987, 990–92 (9th Cir. 1998). The court endorsed Second Circuit precedent, which it construed as holding that "[r]ecovery of damages arising from overseas infringing uses was allowed because the predicate act of infringement occurring within the United States enabled further reproduction abroad." *Id.* at 992. To invoke the predicate-act doctrine, according to the Ninth Circuit, damages must flow from "extraterritorial exploitation of an infringing act that occurred in the United States." *Id.* The court distinguished a previous decision, *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088 (9th Cir. 1994), as controlling only a narrow class of cases dealing with the Copyright Act's "authorization" provision, in which a plaintiff alleges merely a domestic authorization of infringing conduct that otherwise takes place wholly abroad. *L.A. News*, 149 F.3d at 991–92. Such a case presents concerns not relevant to disputes in which a predicate act of infringement—going beyond mere authorization—occurred in the United States. *Id.* at 992. The Ninth Circuit further noted that the predicate-act doctrine does not abrogate a defendant's right to be free from stale claims. *Id.*

At least two other circuits have recognized the validity of the predicate-act doctrine, even if they have not had occasion to squarely apply it to the facts before them. *Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1371 (Fed. Cir. 2008) (endorsing principle that "courts have generally held that the Copyright Act only does not reach activities 'that take place *entirely* abroad' " (quoting *Subafilms*, 24 F.3d at 1098)); *Liberty Toy Co. v. Fred Silber Co.*, 149 F.3d 1183, 1998 WL 385469, at *3 (6th Cir. 1998) (unpublished table decision) ("[I]f all the copying or infringement occurred outside the United States, the Copyright Act would not apply. However, as long as some act of infringement occurred in the United States, the Copyright Act applies." (citations omitted)).

We join our sister circuits that have adopted the predicate-act doctrine. The doctrine strikes an appropriate balance between competing concerns, protecting aggrieved plaintiffs

from savvy defendants while also safeguarding a defendant's freedom from stale claims. Absent the predicate-act doctrine, a defendant could convert a plaintiff's intellectual property in the United States, wait for the Copyright Act's three-year statute of limitations to expire, and then reproduce the property abroad with impunity. Such a result would jeopardize intellectual property rights and subvert Congress's goals as engrafted on to the Copyright Act. But lest the doctrine lead to a windfall for plaintiffs and force a defendant to face liability for stale claims, plaintiffs may collect only those damages "suffered during the statutory period for bringing claims, regardless of where they may have been incurred," *L.A. News*, 149 F.3d at 992.

2.

Applying the predicate-act doctrine to this case, we conclude that Alpha has presented a valid claim under the Copyright Act. Accordingly, we sustain the jury's finding of liability on that count.

Distilling applicable case law, we find that a plaintiff is required to show a domestic violation of the Copyright Act and damages flowing from foreign exploitation of that infringing act to successfully invoke the predicate-act doctrine. Alpha has shown both. Appellants concede on appeal that Alpha has established a domestic violation of the Copyright Act. While in the United States, Vance and Al Dobowi unlawfully converted Alpha's blueprints and reproduced them absent authorization. These acts constitute infringing conduct under the Copyright Act. *See Update Art*, 843 F.2d at 73 (concluding there would be an actionable violation if defendant illegally reproduced image while in the United States). And Alpha has demonstrated damages flowing from extraterritorial exploitation of this infringing conduct. Al Dobowi and Linglong used the converted blueprints to produce mining tires almost identical to those of Alpha. They then sold these tires to former customers of Alpha, causing Alpha substantial

damage. *See Sheldon*, 106 F.2d at 52 (finding damages flowing from foreign exploitation of infringing act where defendant converted negatives of motion picture in United States and exhibited the film abroad).

Effectively granting the validity of the above analysis, Appellants contend that the predicate-act doctrine may not be employed when recovery of damages from a domestic violation of the Copyright Act is barred by the three-year statute of limitations. Because the statute of limitations bars Alpha from collecting damages for activities within the United States, Appellants assert that the jury's Copyright Act verdict may not stand.

We are not persuaded by Appellants' creative interpretation of applicable case law. It may be true that, in each of the cases in which a court has invoked the predicate-act doctrine, the plaintiff would have been eligible to receive a damages award based solely on a domestic infringement. But courts ascribed no relevance to this observation, never discussing the statute of limitations and its effect on the predicate-act doctrine. Quite the opposite, at least the Ninth Circuit anticipated that a plaintiff may collect damages from extraterritorial conduct, even if the statute of limitations bars an award based on domestic infringement. *L.A. News*, 149 F.3d at 992 ("Defendants' argument that adoption of the Second Circuit rule would permit plaintiffs to circumvent the statute of limitation by recovering damages for distribution abroad occurring many years after the infringing act in the United States is without merit. An action must be 'commenced within three years after the claim accrued.' . . . A plaintiff's right to damages is limited to those suffered during the statutory period for bringing claims, *regardless of where they may have been incurred*." (emphasis added)). That Alpha may not collect damages from Appellants' domestic activities is thus of no moment to the analysis, as the district court accurately instructed the jury.

B.

The Appellants next argue that the district court incorrectly denied their Rule 50 motion as to Alpha's Virginia state-law conversion claim because that claim is preempted by the Copyright Act. Conversion under Virginia law requires a showing of "any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights." *Simmons v. Miller*, 544 S.E.2d 666, 679 (Va. 2001). Relevant here, the Copyright Act states:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 [of the Copyright Act] in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title.

17 U.S.C.A. § 301(a). Section 301's "broad preemptive scope," *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 658 (4th Cir. 1993), serves "to insure that the enforcement of these rights remains solely within the federal domain," *Computer Assocs. Int'l Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992). We use a two-part test to determine if a claim is preempted by the Copyright Act, looking at (1) whether the claim "falls within the subject matter of copyright" and (2) whether the claim "protects rights that are equivalent to any of the exclusive rights of a federal copyright." *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir. 2003) (internal quotation marks omitted). "[B]oth prongs of [this] two-factor test must be satisfied for preemption to occur." *Id.*

In applying the "equivalency" prong, we have explained that "reference must be made to the elements of the state cause of action." *Rosciszewski v. Arete Associates, Inc.*, 1 F.3d 225, 229 (4th Cir. 1993). A state cause of action is not

"equivalent" and avoids preemption if the action requires an "extra element [that] transform[s] the nature of the action," *Laws v. Sony Music Entm't Inc.*, 448 F.3d 1134, 1144 (9th Cir. 2006), making it "qualitatively different from a copyright infringement claim," *Altai*, 982 F.2d at 716 (internal quotation marks omitted). *See also Rosciszewski*, 1 F.3d at 230 (same). Applying this standard, we have concluded that claims under the Virginia Computer Crimes Act are preempted, *see Rosciszewski*, 1 F.3d at 230, while claims for misappropriation of trade secrets under Maryland law are not, *see Trandes*, 996 F.2d at 660. Importantly, in *Trandes*, we explained that the focus under § 301 is not on the "conduct" or "facts pled," but on the "elements" of the causes of action. *Id.* at 659.

Most relevant to this case, in *United States ex. rel Berge v. Bd. of Trustees of the University of Alabama*, 104 F.3d 1453 (4th Cir. 1997), we held that the Copyright Act preempted a claim for conversion under Alabama law when no tangible objects embodying the intellectual property were converted. We explained it was "hornbook law that a state law action for conversion will not be preempted if the plaintiff can prove the extra element that the defendant unlawfully retained the physical object embodying plaintiff's work." *Id.* at 1463. (internal quotation marks omitted). "However, § 301(a) will preempt a conversion claim where the plaintiff alleges only the unlawful retention of its intellectual property rights and not the unlawful retention of the tangible object embodying its work." *Id.* (internal quotation marks omitted).

Applying this framework, we conclude that the district court correctly denied the Appellants' Rule 50 motion. In doing so, the district court concluded that Alpha presented sufficient evidence that the Appellants "unlawfully obtained copies" of Alpha's blueprints and retained those copies, thus denying Alpha the "right to control" them. J.A. 1217. Specifically, Alpha proved that "Vance 'took' the blueprints without authorization." J.A. 1217-18. Accordingly, because Alpha was able to "prove the extra element that the defendant

unlawfully retained the physical object embodying plaintiff's work," the Copyright Act does not preempt the conversion claim. *Berge*, 104 F.3d at 1463; *see also Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 501-02 (7th Cir. 2011) (finding conversion claim under Illinois law preempted where plaintiff alleged only "unauthorized publishing, not possession"); *Carson*, 344 F.3d at 456-57 (finding conversion claim under Texas law was not preempted where complaint alleged physical retention of tangible forms).

C.

Appellants further challenge the jury's finding of liability under the Lanham Act, arguing that the statute's sweep does not extend to the extraterritorial acts alleged by Alpha. We agree. Because Appellants' trademark infringement lacks a sufficient effect on U.S. commerce, we find that the Lanham Act does not reach the conduct complained of by Alpha.

Although the Lanham Act applies extraterritorially in some instances, only foreign acts having a significant effect on U.S. commerce are brought under its compass. *Nintendo*, 34 F.3d at 250. Confining the statute's scope thusly ensures that judicial application of the Act will hew closely to its "core purposes . . . , which are both to protect the ability of American consumers to avoid confusion and to help assure a trademark's owner that it will reap the financial and reputational rewards associated with having a desirable name or product." *McBee v. Delica Co.*, 417 F.3d 107, 120–21 (1st Cir. 2005). With these aims in mind, we have reasoned that the archetypal injury contemplated by the Act is harm to the plaintiff's "trade reputation in United States markets." *See Nintendo*, 34 F.3d at 250.

Other circuits have posited that the Lanham Act's significant-effect requirement may be satisfied by extraterritorial conduct even when that conduct will not cause confusion among U.S. consumers. Under this diversion-of-sales theory,

courts find a significant effect on U.S. commerce where sales to foreign consumers would jeopardize the income of an American company. *E.g.*, *McBee*, 417 F.3d at 126. The doctrine is narrowly applied, however, because the injury in this context—harm to a U.S. business's income absent confusion among U.S. consumers—"is less tightly tied to the interests that the Lanham Act intends to protect, since there is no United States interest in protecting [*foreign*] *consumers*." *Id.* Thus courts invoking the diversion-of-sales theory have required the defendants to be U.S. corporations that conducted operations—including at least some of the infringing activity—within the United States. *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 504 (9th Cir. 1991); *Am. Rice, Inc. v. Ark. Rice Growers Coop. Ass'n*, 701 F.2d 408, 414–15 (5th Cir. 1983). Only in such instances is there a sufficient nexus between U.S. commerce and the infringing activity.

Recognizing that it has not alleged confusion among U.S. consumers, Alpha grants that its Lanham Act claims can prevail only if we adopt, for the first time, the diversion-of-sales theory. Although we find compelling the reasons underpinning use of the doctrine in other cases, we decline to apply it to the facts before us. Courts upholding liability under the Lanham Act based solely on harm to a U.S. company's income from foreign infringement have stressed that the defendants in those cases were U.S. companies that conducted substantial domestic business activity. *Ocean Garden*, 953 F.2d at 504; *Am. Rice, Inc.*, 701 F.2d at 414–15. Here, in contrast, Appellants are not U.S. corporations and they lack a pervasive system of domestic operations. Thus we cannot conclude that the extraterritorial conduct—exclusively foreign sales of infringing tires—has a significant effect on U.S. commerce as required by the dictates of the Lanham Act, *see Nintendo*, 34 F.3d at 250. We accordingly hold that the Lanham Act does not afford Alpha relief, and we dismiss its claims under that statute.[8]

---

[8]We also vacate the district court's award of attorneys' fees to Alpha. The court premised the award solely on Alpha's successful Lanham Act claims. Because we dismiss those claims, we must also vacate the award of attorneys' fees.

### D.

Appellants finally contend that the jury's verdict on Alpha's common-law civil conspiracy claims must be set aside and those claims dismissed. We find this argument convincing. Alpha's common-law civil conspiracy claims alleged that the Defendants conspired to infringe Alpha's trademarks and copyrights and to convert Alpha's property. "A common law claim of civil conspiracy" under Virginia law "generally requires proof that the underlying tort was committed." *Almy v. Grisham*, 639 S.E.2d 182, 188 (Va. 2007). If the underlying tort is dismissed for any reason, so, too, must the corresponding conspiracy claim be dismissed. Accordingly, because we have dismissed the Lanham Act claim—the underlying tort for the conspiracy to infringe trademarks claim—the corresponding conspiracy claim must be dismissed as well.

We further conclude that Alpha's claim for conspiracy to infringe its copyrights is preempted by the Copyright Act. As discussed previously, a state-law cause of action is not preempted so long as it requires an element additional to the showing required under the Copyright Act and that element "'changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim,'" *Rosciszewski*, 1 F.3d at 230 (quoting *Computer Assocs.*, 982 F.2d at 716).

We conclude that the additional elements required to prove conspiracy to infringe copyrights are not sufficient to escape the Copyright Act's ambit of preemption. Under Virginia law, "'[t]he gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use an unlawful means.'" *Almy*, 639 S.E.2d at 189 (quoting *CaterCorp, Inc. v. Catering Concepts, Inc.*, 431 S.E.2d 277, 281–82 (Va. 1993)). Thus the core of the claim for conspiracy to infringe copyrights is identical to that under the Copyright Act, and the extra element of agreement or combination does not make it

otherwise. *Brown v. McCormick*, 23 F. Supp. 2d 594, 608 (D. Md. 1998) ("[W]hile the formulation for civil conspiracy adds the element of agreement to the elements that copyright infringement requires, the right protected by such a cause of action in this case would serve merely to vindicate the same right as under the Copyright Act."). Alpha's claim for conspiracy to commit copyright infringement must therefore be dismissed as preempted by the Copyright Act.

Turning to Alpha's final conspiracy claim—conspiracy to convert—we find this claim should not be dismissed. First, in contrast to the conspiracy to infringe trademarks, we have upheld the jury's liability finding on the conversion claim. Second, in contrast to the conspiracy to infringe copyrights, the conspiracy to convert claim is not subject to preemption for the same reasons the underlying conversion claim was not.

Accordingly, although we find that the conspiracy to infringe trademarks and copyrights claims must be dismissed, the conspiracy to convert claim remains meritorious. We are thus faced with the question of whether the jury's verdict on the civil conspiracy claim may stand given these conclusions. We believe it cannot. The district court instructed the jury that "[y]ou may find defendants liable for conspiracy to commit one, two, or all three of the underlying torts." (J.A. 1098). The jury verdict form on this claim required the jury to find in favor of either Alpha or the Defendants on the "Civil Conspiracy" claim, but did not require the jury to issue a special finding of which underlying torts the Defendants conspired to commit. In rejecting the Defendants' Rule 50 motion on this claim, the district court concluded that the conspiracy verdict could stand even after it dismissed several of the trademark infringement claims because "the jury could not have found a conspiracy to commit trademark infringement without also finding a conspiracy to commit copyright infringement." (J.A. 1240-41). We have now, however, also dismissed the conspiracy to infringe copyright claims and, under the district court's

own rationale, we believe the proper course is to set aside the jury's verdict on this count.[9]

## IV.

Finally, we turn to the jury's damages award.[10] We have concluded that the district court properly exercised jurisdiction over the Appellants. We also uphold the jury's determination that the Appellants are liable to Alpha under the Copyright Act and for conversion under Virginia law, but we dismiss the remaining claims against the Defendants. The question that remains is whether, in light of the fact that we are reversing the jury's verdict on some claims, a new trial for damages is required. The Appellants raised this argument below in a Rule 59 motion for a new trial after the district court dismissed several of the Lanham Act claims, but the district court rejected it. We review the district court's refusal to

---

[9]This conclusion comports with the Supreme Court's recognition that when a jury issues a general verdict on multiple theories of liability and one of those theories is overturned on appeal, the entire verdict falls. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 30 (1962); *United New York and New Jersey Sandy Hook Pilots Association v. Halecki*, 358 U.S. 613, 619 (1959). This general verdict rule is discussed in greater detail in Part IV.

[10]Consistent with Virginia law, the jury's finding of guilt on the civil conspiracy claim meant that the Appellants were held jointly and severally liable for the damages award. *Worrie v. Boze*, 95 S.E.2d 192, 198 (Va. 1957), *abrogated on other grounds by Station #2, LLC v. Lynch*, 695 S.E.2d 537, 541 (Va. 2010) (holding that, under Virginia law, "conspirators are jointly and severally liable for all damage resulting from the conspiracy." ); *see also Loughman v. Consol-Pennsylvania Coal Co.*, 6 F.3d 88, 103 (3d Cir. 1993) (noting "the law of conspiracy establishes that every conspirator is jointly and severally liable for all acts of co-conspirators taken in furtherance of the conspiracy"). Although we vacate the civil conspiracy verdict because of the dismissal of the underlying tort of trademark infringement and the preemption of the conspiracy to infringe copyrights claim, that action does not undercut the jury's factual conclusion that the Defendants undertook activities jointly. Accordingly, we do not disturb the conclusion that the Defendants are jointly and severally liable to Alpha.

award a new damages trial for abuse of discretion. *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 242 (4th Cir. 2009).

The Supreme Court has recognized that when a jury issues a general verdict on multiple theories of liability and one of those theories is overturned on appeal, the entire verdict falls. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 30 (1962); *United New York and New Jersey Sandy Hook Pilots Association v. Halecki*, 358 U.S. 613, 619 (1959). We have followed this rule as well, explaining "[o]ur rule is that because of the impossibility of knowing but what the jury's verdict rested on the legal erroneous theory, such a general verdict may not stand as a basis for judgment." *Flowers v. Tandy Corp.*, 773 F.2d 585, 591 (4th Cir. 1985). In this case, however, the jury completed a special verdict form as to liability, but issued only a general verdict on the damages award.

In *Barber v. Whirlpool Corp.*, 34 F.3d 1268 (4th Cir. 1994), we addressed whether the general verdict rule extended to such situations. There, the plaintiff brought two separate claims (intentional infliction of emotional distress and malicious prosecution) that stemmed from two separate incidents. The verdict form "made it clear that the jury found Whirlpool liable" for both claims, and that it issued a "global figure" for damages—$75,000 actual and $125,000 punitive. *Id.* at 1278. On appeal, we reversed the district court's denial of Whirlpool's motion for judgment as a matter of law on the emotional distress claim. We then extended the *Flowers* rule to the damages award, concluding that a "new trial is necessary on the damages issue" because the jury did not "distinguish[ ] the amount attributable to each claim." *Id.*

In this case, the district court concluded that a new trial is unnecessary—even after it dismissed several of the Lanham Act claims—because the "damages award in this case would have been the same regardless of whether all eleven or only

two of the trademark claims were submitted to the jury." (J.A. 1237). The court based this determination on the damages provision of the Copyright Act, 17 U.S.C. § 504(b), which states "[t]he copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement." In this case, Alpha's expert witness testified that the Appellants realized $36 million in sales of infringing tires, although there was some dispute regarding whether all of the sales were within the three-year limitations period under the Copyright Act. The jury awarded $26 million—which the district court noted was the amount of sales within the three-year limitations period. The Appellants contend that, under *Barber*, with some of Alpha's theories of liability set aside, the district court abused its discretion and a new trial on damages is necessary. We disagree.

While remaining cognizant of the general verdict rule, courts "have engrafted a sort-of harmless error gloss onto the basic principle." *Muth v. Ford Motor Co.*, 461 F.3d 557, 564 (5th Cir. 2006). An error is harmless in this context "'where it is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it.'" *Braun v. Flynt*, 731 F.2d 1205, 1206 (5th Cir. 1984) (quoting *E.I. Du Pont de Nemours v. Berkley & Co., Inc.*, 620 F.2d 1247, 1258 n.8 (8th Cir. 1980)), *quoted with approval by Henderson v. Winston*, No. 94-2017, 1995 WL 378602 at *5 (4th Cir., June 27, 1995). *See also Davis v. Rennie*, 264 F.3d 86, 105 (1st Cir. 2001) (same).

*Quigley v. Rosenthal*, 327 F.3d 1044, 1073-74 (10th Cir. 2003), exemplifies this sensible approach. In *Quigley*, the Tenth Circuit faced a similar situation to this case, having dismissed one of five claims in a case where the jury issued a special verdict on liability but awarded a lump-sum of compensatory damages. On appeal, the Tenth Circuit found that the damages award could stand because reversal on one of the counts "has no effect on the damages award," particularly

because the district court had noted that the damages for each of the five claims were "the same." *Id.* at 1074.

In addition to this caselaw, the Federal Rules of Civil Procedure also counsel harmless error review of trial errors:

> [N]o error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

Fed. R. Civ. P. 61. Rule 61 "directs courts to disregard any error or defect in the proceeding" unless the error is "'prejudicial: It must have affected the outcome of the district court proceedings.'" *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 168 (D.C. Cir. 2007) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).

Applying this harmless error approach, we affirm the district court's denial of a new trial on damages. Unlike *Barber*, but like *Quigley*, the claims in this case are predicated on the same conduct, and the maximum recovery for each claim is the "same." *Quigley*, 327 F.3d at 1074. To the extent the recoveries differ, the Copyright Act offers the most generous relief—the defendants' profits. In sum, we are "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it," and that any error was therefore harmless. *Braun*, 731 F.2d at 1206.

V.

We hold that the district court properly exercised jurisdiction over Appellants. Turning to the merits, we conclude that Alpha presented an actionable claim under the Copyright Act and for conversion under Virginia law, but that its remaining

claims must be dismissed. Finally, we affirm the jury's damages award in favor of Alpha, but we vacate the district court's award of attorneys' fees.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND VACATED IN PART*

DIAZ, Circuit Judge, dissenting in part:

I join Parts I–III of the majority opinion. But because our precedent squarely forecloses sustaining a general award of compensatory damages when a theory of liability has been dismissed postverdict, I dissent from the majority's ruling in Part IV. I would instead vacate the jury's damages award and remand the case for a limited trial on damages.

## I.

## A.

As the majority forthrightly recognizes, long-standing Supreme Court precedent dictates that a general verdict be overturned when one theory of liability is dismissed. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.*, 370 U.S. 19, 30 (1962). In such a case, the jury finds the defendant generally liable but does not specify which of the multiple claims submitted to it supports the liability determination. Because a general verdict "'prevents us from perceiving upon which plea [the jury] found'" the defendant liable, we are required to nullify the verdict if just one of the potential grounds for liability is overturned. *Id.* (quoting *Maryland v. Baldwin*, 112 U.S. 490, 493 (1884)); *see also Flowers v. Tandy Corp.*, 773 F.2d 585, 591 (4th Cir. 1985) ("[B]ecause of the impossibility of knowing but what the jury's verdict

rested on the legally erroneous theory, such a general verdict may not stand as the basis for judgment.").

Even when dismissal of a claim does not jeopardize the jury's liability verdict, it might call into question the damages award. We confronted just this situation in *Barber v. Whirlpool Corp.*, 34 F.3d 1268 (4th Cir. 1994). There, two claims were submitted to the jury, which found the defendant liable on each count. *Id.* at 1271, 1278. The jury awarded the plaintiff $75,000 in actual damages and $125,000 in punitive damages, but it did not apportion the amounts on a per-claim basis. *Id.* On appeal, we dismissed one of the successful claims for insufficient evidence. *Id.* at 1276. We then vacated the damages award, accepting the defendant's argument that the general award could not stand after dismissal of one of the two claims. *Id.* at 1278.

Turning first to the award of actual damages, we noted that "the liability verdict need not be disturbed because the verdict form made it clear that the jury found [the defendant] liable for both [claims]." *Id.* Concluding next that the award of actual damages could not stand, we rejected the plaintiff's argument—one strikingly similar to that advanced by Alpha. The plaintiff maintained that we could sustain the damages verdict as long as a single upheld finding of liability supported the entire damages award. *Id.* We cursorily rejected this position as a blatant contravention of Supreme Court precedent. "[W]e must apply the *Flowers* rule," we wrote, "and vacate the damages award." *Id.*

We next considered whether we could uphold the award of punitive damages in light of our postverdict dismissal of a theory of liability. Under South Carolina law, which governed the dispute, punitive damages were permissibly awarded where the defendant's conduct was willful, wanton, or reckless. *Id.* The jury's general verdict precluded us from determining on which claim it based its award of punitive damages. *Id.* at 1279. Because substantial evidence did not

support one of the two claims submitted to the jury and the verdict was ambiguous, we also vacated the punitive-damages award. *Id.*

Seizing on the sufficiency-of-the-evidence language from *Barber*, we upheld a general award of punitive damages in the face of postverdict dismissal of a claim in *Johnson v. Wal-Mart Stores, Inc.*, 178 F.3d 1284, 1999 WL 314660 (4th Cir. 1999) (per curiam) (unpublished table decision). The jury in *Johnson* found for the plaintiff on two of the three claims submitted to it, awarding $19,280 in actual damages and $38,000 in punitive damages, the latter of which were not apportioned on a per-claim basis. *Id.* at *2. In a post-trial motion, the district court dismissed one of the two successful claims, reasoning that failure to do so could lead to an impermissible double recovery for actual damages under state law. *Id.* at *3–4. On appeal, we rejected the defendant's argument that the punitive-damages award must be set aside, reasoning that "the district court's entry of judgment as a matter of law in favor of [the defendant] on [the plaintiff's] slander claim created no ambiguity in the jury's award of punitive damages." *Id.* at *4. While not disturbing *Barber*'s analysis of general awards of actual damages, we limited its mandate in the punitive-damages domain to cases in which a claim dismissed post-verdict is "infirm due to insufficient evidence." *Id.* Because sufficient evidence supported the only dismissed theory of liability in *Johnson*, we affirmed the punitive-damages award. *Id.*

### B.

Viewing this case through the prism of *Barber*, I am unable to conclude that the general damages award may stand. Rather, a straightforward application of the rule announced in that decision compels vacating the award.

I note first that the principles enunciated in *Sunkist* do not require us to overturn the verdict as to liability. Unlike the

general verdict entered by the jury in *Sunkist*, the jury here enumerated a separate finding of liability for each of the five claims submitted to it. Even taking into account that only two of the counts submitted to the jury are actionable—those for violation of the Copyright Act and state-law conversion—we need not disturb the liability verdict. *See Barber*, 34 F.3d at 1278.

The damages award, however, does not fare so well under our precedent. Proper disposition of the case begins and ends with *Barber*. In that case, we rejected an argument identical to that advanced by Alpha. Even if an upheld theory of liability supports the general damages award in full, we reasoned that we must nevertheless vacate the award when another claim is dismissed postverdict. *Id.* In this case, the district court dismissed Alpha's registered-trademark claim postverdict for insufficient evidence. It moreover dismissed Alpha's unregistered-trademark claim as to nine of eleven marks, also for lack of evidence. The damages award consequentially may not stand under a faithful reading of *Barber*.

Nothing in our subsequent decisions calls into question *Barber*'s treatment of general damages awards, at least where—as here—an award of punitive damages is not at issue. Our decision in *Johnson* drew on language from *Barber* to conclude that a general punitive-damages award may stand even when a claim is dismissed postverdict, so long as at least one upheld theory of liability supports the award and the dismissed claim was not defective for insufficient evidence. *Johnson*, 1999 WL 314660, at *4. Distinguishing a general award of compensatory or actual damages from one of punitive damages makes sense, given the comparatively loosey-goosey nature of determining the proper amount of punitive damages. Where actual or compensatory damages must be tethered to the claims with some mathematical precision, a jury may—within constitutional limits—award punitive damages on a global basis based on standards that require little more than a subjective judgment as to what amount is suffi-

cient to deter or punish the defendant for its conduct. It comes as no surprise, then, that dismissal of a single claim on grounds unrelated to the sufficiency of the evidence did not move the panel in *Johnson* to question the jury's award of punitive damages where another viable claim remained and the evidence supporting the award was not impugned. The general damages award in this case, however, is entirely compensatory, so *Johnson* does not affect our analysis. Instead, *Barber* controls and requires that we vacate the award.

## II.

To be sure, the majority's approach to the damages issue holds a great deal of intuitive appeal. Its model vindicates the will of the jury while promoting judicial economy and the conservation of resources. Were we writing on a blank slate, I would enthusiastically embrace its analysis. Constrained as we are by our precedent, however, I must respectfully dissent from Part IV of the majority opinion.